IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

LINDA B. MATARESE, *et al.*,    )
    )
        Plaintiffs,    )
    )    CASE NO. 1:09-CV-0857
v.    )
    )
ARCHSTONE PENTAGON CITY (f/k/a    )
Parc Vista), *et al.*,    )
    )
        Defendants.    )

## MEMORANDUM OPINION

THIS MATTER is before the Court on a six-day nonjury trial for the housing

discrimination claims of Plaintiffs Ms. Linda and Mr. Domenic Matarese against Defendants

Smith Property Holdings Parc Vista LLC ("SP Holdings"), Archstone Communities, LLC, Mr.

Malcolm McGregor, Mr. Mitchell Mann, and Mr. Amilcar Garcia.[1] This case is a housing

---

[1] Of the originally-named Defendants, only these Defendants still have pending claims against them. SP Holdings is the entity that owns Archstone Pentagon City ("APC"), the building in which Plaintiffs reside. Archstone Communities, LLC is the entity that operates and manages APC on behalf of SP Holdings and exclusively employs each of the individual Defendants. Mr. Malcolm McGregor was the Assistant Community Manager of APC from May 2006 to May 2007 and has served as Community Manager of APC from May 2008 to the present. Mr. Mitchell Mann is the Operations Manager, who, at all relevant times, oversaw and supervised the management of APC. Finally, Mr. Amilcar Garcia has been the Service Manager for APC from October 2007 to the present, before which time he served as a service technician on an as-needed basis. In addition to these Defendants, Plaintiffs originally named as Defendants (1) Archstone Pentagon City (f/k/a Parc Vista); (2) Archstone MultiFamily Series I Trust, which holds the controlling interest in Archstone LLC; (3) Archstone LLC, which owns SP Holdings; (4) Deeqa Nur, former Community Manager of APC (2005 to 2006) and acting Community Manager during the summer of 2008; and (5) Katrina Wood, receptionist at APC. All claims against Defendants APC, Archstone MultiFamily Series I Trust, Archstone LLC, Deeqa Nur, and Katrina Wood have been dismissed.

disability discrimination action arising under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.* (2006),[2] and the Virginia Fair Housing Law ("VFHL"), Va. Code Ann. §§ 36-96.1 *et seq.* (2000).[3] Plaintiffs Ms. Linda and Mr. Domenic Matarese claim that Defendants violated these federal and state fair housing laws by discriminating against them because of Ms. Matarese's handicap.

On July 31, 2009, Plaintiffs filed their original Complaint, which they amended on December 30, 2009 and again on March 3, 2010.[4] In their Second Amended Complaint, Plaintiffs asserted the following claims of discrimination on the basis of handicap: refusal to rent in violation of FHA § 3604(f)(1) and VFHL § 36-96.3(A)(8) (Counts I & II); discrimination in the terms, conditions, and privileges of the rental of a dwelling in violation of FHA § 3604(f)(2) and VFHL § 36-96.3(A)(9) (Counts III & IV); refusal to make reasonable accommodations in rules, policies, practices, and services in violation of FHA § 3604(f)(3)(B) and VFHL § 36-96.3(B) (Counts V & VI); notice and statement of preference, limitation, or discrimination based on handicap in violation of FHA § 3604(c) and VFHL § 36-96.3(A)(3) (Counts VII & VIII);

---

[2] The Fair Housing Amendments Act of 1988 amended Title VIII of the Civil Rights Act of 1968, known as the Fair Housing Act. The amendments, *inter alia*, extended the FHA's protections to cover "handicapped persons". The original Act and the amendments extending protection over individuals with a handicap will be referred to together as the FHA.

[3] Because the VFHL largely tracks the FHA, the parallel claims will be analyzed under the same standards unless stated otherwise. *See Moseke v. Miller and Smith, Inc.*, 202 F. Supp. 2d 492, 495 n.2 (E.D. Va. 2002).

[4] Plaintiffs first amended their original Complaint as a matter of course. Subsequently, Plaintiffs filed their Second Amended Complaint without seeking leave of Court pursuant to Federal Rule of Civil Procedure 15(a)(2). However, Magistrate Judge Anderson considered Plaintiffs' then-*pro se* filings as a request for leave to file the Second Amended Complaint and, in an Order dated June 2, 2010, granted Plaintiffs leave to file their Second Amended Complaint.

statements intended to coerce, intimidate, threaten, or interfere with Plaintiffs' exercise of enjoyment of fair housing in violation of FHA § 3617 and VFHL § 36-96.5 (Counts IX & X); negligence as to the Archstone Defendants and Defendants McGregor, Mann, and Nur (Count XI); and retaliation in violation of FHA § 3617, VFHL § 36-96.5, and regulation 135-50-220 of the Virginia Fair Housing Regulations (Count XII).

At the summary judgment stage, only Counts I-VIII, XI, and XII remained.[5] Pursuant to the Court's November 23, 2011 Order and January 5, 2011 Memorandum Opinion, the Court granted in part and denied in part Defendants' Motion for Summary Judgment. The following claims proceeded to trial: refusal to rent in violation of FHA § 3604(f)(1) and VFHL § 36-96.3(A)(8) (Counts I & II) (collectively, "refusal to rent claims"); discrimination in the terms, conditions, and privileges of the rental of a dwelling in violation of FHA § 3604(f)(2) and VFHL § 36-96.3(A)(9) (Counts III & IV); notice and statement of preference, limitation, or discrimination based on handicap in violation of FHA § 3604(c) and VFHL § 36-96.3(A)(3) (Counts VII & VIII); and retaliation in violation of FHA § 3617, VFHL § 36-96.5, and regulation 135-50-220 of the Virginia Fair Housing Regulations (Count XII). Based on these remaining claims, the following issues are before the Court.

---

[5] In an Order dated March 22, 2010, the Court dismissed Counts IX and X of the Complaint. Plaintiffs agreed that this dismissal applied to the amended Complaints. Subsequently, in an Order dated May 29, 2010, the Court granted Defendants' Judgment on the Pleadings as to Defendant Katrina Wood on Counts I-VIII and Defendant Deeqa Nur on Counts I-IV, VII, and VIII. Finally, in an Order dated July 26, 2010, the Court granted Defendants Nur and Wood's Motion to Dismiss Count XII, which effectively dismissed Defendant Wood as a party to the case. Upon Defendants' oral motion at the July 23, 2010 hearing, Defendant Wood was officially dismissed because there were no remaining claims pending against her. Pursuant to this Court's Order on Defendants' Motion for Summary Judgment, Defendant Nur was dismissed from the case because there were no longer claims pending against her.

The first issue is whether Ms. Matarese qualifies as an individual with a handicap under the FHA. The Court holds that Plaintiffs have proven that Ms. Matarese qualifies as an individual with a handicap under the FHA because Defendants regarded her as having a condition that substantially limited her breathing and treated her as such.

The second issue is whether Defendants discriminated against Plaintiffs on the basis of Ms. Matarese's handicap in violation of FHA § 3604(f)(1) and VFHL section 36-96.3(A)(8) when they decided not to renew Plaintiffs' lease and refused to allow Plaintiffs to rent an apartment at another Archstone location. The Court finds that Defendants discriminated against Plaintiffs on the basis of Ms. Matarese's handicap by nonrenewing Plaintiffs' lease, converting them to a month-to-month tenancy, and refusing to allow them to rent at a different Archstone location because the actions were taken with discriminatory intent.

The third issue is whether Defendants discriminated in the terms, conditions, and privileges of the rental of a dwelling because of Ms. Matarese's handicap in violation of FHA § 3604(f)(2) and VFHL section 36-96.3(A)(9). The Court holds that Defendants violated FHA § 3604(f)(2) and VFHL section 36-96.3(A)(9) by denying Plaintiffs' the benefits, including rental discounts, afforded to long-term residents when they increased Plaintiffs' rent by an exorbitant rate and by converting Plaintiffs to a month-to-month tenancy instead of renewing their 12-month lease.

The fourth issue is whether Defendants McGregor and Mann made discriminatory statements with respect to the rental of a dwelling in violation of FHA § 3604(c) and VFHL section 36-96.3(A)(3) by making statements during the decision-making process that, under the ordinary listener standard, indicated a preference, limitation, or discrimination against Ms. Matarese on the basis of her handicap. The Court holds that, under the ordinary listener

4

standard, Defendants McGregor and Mann made discriminatory statements against Ms. Matarese on the basis of her handicap when (1) Defendant McGregor told Ms. Matarese that they were not renewing Plaintiffs' lease because they were tired of accommodating her chemical sensitivities, and (2) Defendant Mann told Ms. Matarese that they would not reconsider the nonrenewal or transfer Plaintiffs to a different Archstone location because there were other communities in the area that would better meet her needs.

The fifth issue is whether Defendants retaliated against Plaintiffs for engaging in protected activity in violation of FHA § 3617, VFHL section 36-96.5, and regulation 135-50-220 of the Virginia Fair Housing Regulations for exercising protected activity. The Court finds that Defendants retaliated against Plaintiffs for engaging in protected activity when they decided not to renew Plaintiffs' lease, refused to allow Plaintiffs to rent an apartment at another Archstone location, decided not to renew the lease of Ms. Matarese's mother, and increased the rent of Plaintiffs' and Ms. Bauman at exorbitant rates because Plaintiffs engaged in protected activity.

The sixth issue is whether Plaintiffs are entitled to compensatory and punitive damages, attorney's fees and costs, prejudgment interest, and injunctive relief because they have demonstrated that they were injured as a result of Defendants' discrimination. The Court holds that Plaintiffs are entitled to (1) compensatory damages for the economic loss they suffered as a result of Defendants' FHA and VFHL violations; (2) compensatory damages for emotional distress; (3) punitive damages as against Defendant McGregor; (4) attorneys' fees and costs; (5) prejudgment interest; and (6) equitable relief to correct any lingering discrimination and prevent future occurrence.

# I. STANDARD OF REVIEW

In a non-jury case, the court must make specific findings of fact and separately state its conclusions of law. Fed. R. Civ. P. 52(a)(1). The trial judge has a function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable. *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957) (citation and internal quotation marks omitted). The trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. *Id.* (citation and internal quotation marks omitted); *see Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) (internal quotation omitted) (stating that that factfinder is in a better position to make judgments about the reliability of some forms of evidence, including evaluation of the credibility of witnesses). It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses. *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889 (4th Cir. 1964).

To satisfy the demands of Rule 52(a), a trial court must do more than announce statements of ultimate fact. *United States ex rel. Belcon, Inc. v. Sherman Const. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986) (citation omitted). The court must support its rulings by spelling out the subordinate facts on which it relies. *Id.*

The language of Rule 52 has been construed

> not to require a court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if the special affirmative facts found by the court, construed as a whole, negative each rejected contention. The ultimate test as to the adequacy of the findings will

6

> always be whether they are sufficiently comprehensive and pertinent to the issues
> to provide a basis for decision and whether they are supported by the evidence.

*Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962). This rule does not

require that the trial court set out findings on all the myriad factual questions that arise in a case.

*Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 433 (5th Cir. 1977). As to whether

findings of fact are sufficient depends upon the particular facts of each individual case, and no

general rule can govern. *Darter*, 301 F.2d at 75.

## II. FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence and testimony

admitted during trial.

Plaintiffs Linda and Domenic Matarese, a married couple, have rented and lived at APC

in Arlington, Virginia for over 18 years, with only a brief period of absence from April 1996 to

September 1997. Plaintiffs have lived in unit 1405 at APC since 1997. Since 2001, Ms. Hilda

Bauman, Ms. Matarese's 95-year-old mother, has lived in unit 1411 at APC, which is directly

across the hall from Plaintiffs' apartment. Ms. Matarese, as Ms. Bauman's only child, attends to

Ms. Bauman's emotional, financial, and minor physical needs.[6] Ms. Matarese handles all

matters with APC in connection with Ms. Bauman's unit.

For many years, and at all times relevant to this case, Ms. Matarese has informed

Archstone managers of her sensitivities to paint fumes, tobacco smoke, and mold, and she

complains of immediate and strong reactions when exposed to fresh paint and paint fumes,

smoke, and mold, which, at times, can be physically debilitating. Ms. Matarese's reactions

---

[6] Ms. Bauman has a caregiver who tends to most of Ms. Bauman's physical needs.

when exposed to these chemicals include dizziness, coughing, and debilitating headaches, sore throats, and respiratory infections, which affect her ability to breathe.

Due to the reactions she experiences, Ms. Matarese has become extremely afraid of exposure to chemicals. Ms. Matarese has not spent a night away from her home in approximately 15 years and only leaves the apartment when necessary, such as to visit doctors or to buy groceries. She has sanitized her apartment of potentially offensive chemicals and generally avoids entering other APC apartments other than that of her mother, Ms. Bauman. As explained below, Ms. Matarese informed APC personnel many times of her chemical sensitivities to paint, smoke, and mold, and, when she experienced exposure to such chemicals, she requested various accommodations to address her chemical sensitivities.

**Ms. Matarese's Exposure to Paint and Requested Accommodations**

The Archstone Defendants testified that painting and renovations are routine at APC. In addition to projects that are undertaken on an as-needed basis, apartments are freshly painted before new tenants move in. Many of Plaintiffs' allegations relate to a renovation project that took place from the end of 2006 through 2008. The renovation project entailed cleaning and painting the exterior surfaces of the windows, doors, and handrails of every unit at APC. Completion of the project required some painting from inside the units to paint the areas that could not be accessed from the outside. APC used paint containing volatile organic compounds ("VOC paint"), which can cause respiratory and other health problems in susceptible persons.[7]

In the last few months of 2006, APC was powerwashed, and the exterior painting began. Ms. Matarese became ill from the exterior painting, complaining of a respiratory infection that

---

[7] In 2005, Virginia prohibited the sale of oil-based or VOC paints.

lasted for several months. In a letter dated May 10, 2007, APC informed tenants, including Plaintiffs and Ms. Bauman, that personnel needed to enter their units to paint those areas on the window frames that could not be reached from the outside.

On May 14, 2007, Ms. Matarese had a meeting with Defendant McGregor to discuss the painting inside her apartment. She presented him with two letters: one from herself and one from Dr. Alpan, the allergist that she started seeing in December 2006. In her letter to Mr. McGregor, Ms. Matarese requested that APC refrain from painting inside her unit. She explained that, after the powerwashing of the building and painting of the exterior with metal paint, she became sick with a respiratory infection that was incurable for several months. She informed Mr. McGregor that she had seen several doctors and had taken several antibiotics in an attempt to cure her respiratory infection. Dr. Alpan's later, dated March 27, 2007, stated that he had been treating Ms. Matarese for multiple allergies, chemical sensitivities, and respiratory infections, and that Ms. Matarese also suffers from chronic fatigue syndrome and fibromyalgia. In his letter, Dr. Alpan requested that APC "avoid exposing Ms. Matarese to paint, chemicals, fumes, dust, mold, and any other substances that could further denigrate her immune system and will have a negative impact on her health and safety."

At the meeting, Mr. McGregor became visibly angry and denied Ms. Matarese's request for accommodations. He told her that Archstone had a right to paint inside tenants' units in whatever manner they chose. Ultimately, the apartments of Plaintiffs and Ms. Bauman were not painted as scheduled in May 2007.

Months later, in a letter dated October 30, 2007, Defendants provided tenants with a new schedule for the painting in the interior of tenants' apartments. Ms. Bauman's windows were

scheduled to be painted on November 12, 2007, and Plaintiffs' windows were scheduled to be painted on November 14, 2007.

On November 12, 2007, the windows of Ms. Bauman's apartment were painted. Both Ms. Bauman and Ms. Matarese testified about the painting inside Ms. Bauman's apartment. They recalled that it was raining on the day Archstone painted the windows inside Ms. Bauman's apartment, and the smell of the paint was so strong that Ms. Bauman went to her daughter's apartment. Ms. Bauman recalled that the paint fumes traveled through the apartment and hallway into Ms. Matarese's apartment. Ms. Bauman testified that this was a problem due to her daughter's sensitivities to paint smells. Despite Ms. Matarese's requests, no attempt was made to contain the paint fumes or otherwise shield Ms. Matarese's apartment from the paint fumes. The fumes were so great that Ms. Bauman had to stay in Plaintiffs' apartment for one week.

The morning after Ms. Bauman's windows were painted, Ms. Matarese received a voicemail message from Defendant Mann, stating that they planned to paint the windows of Plaintiffs' apartment on November 14, 2007. Ms. Matarese returned Mr. Mann's call and asked whether he knew about her chemical sensitivities and health condition and whether he had reviewed the documentation she had previously submitted to Defendant McGregor. Defendant Mann told Ms. Matarese that he "understood what she was dealing with," and, if they needed to arrange for her to be out of her apartment while the paint dried and fumes cleared, "that's what they would have to do." He stated, however, that they had to finish the job. Ms. Matarese stressed that her complaints were not made up, that she was "severely chronically ill," and he needed to understand her condition. She explained that she had tried to get APC to paint during the summer when the windows could be left open to facilitate the drying of the paint and clearing of the fumes, but, in the wet, November weather, the paint fumes were not dissipating as quickly.

10

She had hoped that she would be able to stay at her mother's apartment, but there were still paint fumes from the painting that occurred the previous day, which would prevent her from staying there. Ms. Matarese faxed Mr. Mann the letter from Dr. Alpan that she had given to Mr. McGregor in May and told him she would follow up with him after he had a chance to review it.

After Defendant Mann had a chance to review the letter, Ms. Matarese called Mr. Mann to follow up about the painting project. She asked him: "Are you satisfied after reading the letter that the painting could harm me?" Mr. Mann responded: "Yes. I am satisfied. I mean . . . I have been. I've known that for quite some time." He reiterated that they still needed to complete the painting, but he agreed that Ms. Matarese should not be in the apartment while they were doing the work. He told her that they would need to "accommodate" her and work together to get it done.

Ms. Matarese requested that Defendants use non-VOC paint, but Defendant Mann refused, stating that he knew there were paints that would be less likely to cause a problem, but it was unlikely that it would cover the metal surfaces. Mr. Mann suggested that they wait until Ms. Bauman's unit was dry, and then Ms. Matarese could stay there. Ms. Matarese told Mr. Mann that it would need to be completely dry because of her allergies to paint. Mr. Mann agreed that they would have to wait for Ms. Bauman's apartment to dry before they started painting in Plaintiffs' apartment, so Ms. Matarese could stay there. Then, they would wait for Plaintiffs' apartment to dry completely before Ms. Matarese could return to her unit. He said there was no other way around it. Ms. Matarese again asked whether Mr. Mann understood her condition, and he confirmed that he did. They agreed that they would have another call after Mr. Mann checked the status of Ms. Bauman's apartment.

11

On November 16, 2007, Ms. Matarese called Mr. Mann and explained that the paint was still not dry in her mother's apartment. Ms. Matarese told him that her mother had returned to her own unit, but that Ms. Matarese would not be able to stay there. She asked why APC could not take the windows out and paint them elsewhere, rather than painting them in her apartment. Mr. Mann told her that they needed to get into her unit to paint and offered to arrange for Ms. Matarese to stay at a hotel, but she determined that was not an option based on her chemical sensitivities.

That day, Ms. Matarese obtained a letter from Dr. Williams and submitted it to APC personnel. In his letter, dated November 16, 2007, Dr. Williams wrote:

> I have treated Linda Matarese for multiple allergies, chemical sensitivities, and resulting bacterial rhinosinusitis for several years. Exposure of this patient to fumes and outgassing as a result of paint chemicals and other substances could predispose her to further difficulty to treat infections and have a negative impact on her health and safety.

No action was taken with respect to Plaintiffs' apartment in November 2007.

On June 5, 2008, there was a major leak in Plaintiffs' apartment. An 8-foot-by-10-foot section of drywall near Plaintiffs' bedroom needed to be replaced and painted. Ms. Matarese told Defendant Garcia that she became very ill and got a respiratory infection when exposed to VOC paint and requested that he use a non-VOC paint. Ms. Matarese provided Defendant Garcia with information about the non-VOC paint that had previously been used in her apartment. Defendant Garcia told Ms. Matarese that he did not know about non-VOC paint, and that her apartment would be painted with the same paint that was used on all of the other apartments. He then painted the wall with VOC paint.

At around that same time in June 2008, a leak developed in Ms. Bauman's apartment. The wall and ceiling were wet, and mold appeared to be growing in the area of the leak. Ms.

Matarese reported the problem to the front desk, explaining that they observed black, gelatinous material growing on the wall. Service technician Mr. Reilly came to investigate and determined that there was in fact a leak, with water pouring onto the floor. They discovered that the entire wall in apartment 1611, the unit above Ms. Bauman's apartment, was covered in mold. Mr. Reilly removed the sections of the wall from Ms. Bauman's apartment that were wet and appeared to have mold growth. Subsequently, there were recurring problems with the leak and mold growth in Ms. Bauman's apartment. APC personnel did not follow their mold remediation protocol and remediate Ms. Bauman's unit, even though they found mold in the apartment above Ms. Bauman's unit that caused the problem in Ms. Bauman's unit. APC's mold remediation protocol required APC personnel to monitor and investigate reports of mold, to correct and clean the moisture source, and to prevent the mold growth from returning. Mr. McGregor explained that the reason they did not follow APC mold remediation protocol was that trained personnel, including himself, determined that there was no mold growth in Ms. Bauman's apartment, and the drywall was only darker because it was wet from the leak.

Also in June 2008, Ms. Matarese experienced problems with exposure to smoke. APC is a smoking building. The tenants that moved in to the apartment next to Plaintiffs' apartment smoked frequently. The hallway ventilation system was broken at the time, so the smoke permeated the hallway, and it started coming into Plaintiffs' apartment. On June 13, 2008, Ms. Matarese spoke with Mr. McGregor about the problem and requested that he put weather stripping around the door to the neighbor's apartment and a door sweep to cover the space between the door and the floor, so the smoke would not leak out into the hallway. Ms. Matarese explained that she was terribly ill with a respiratory infection and told Mr. McGregor that she was having breathing difficulty. To address this problem, approximately a month later, Mr.

13

McGregor provided three small air purifiers. However, they were not adequate to ameliorate the problem. In addition, Mr. Garcia came in and sealed a crack that Ms. Matarese found near her patio.

During that time, Ms. Matarese and Ms. Bauman had been experiencing severe sore throats and coughs and had repeatedly gone to see Dr. Williams to address the problems. On June 25, 2008, Ms. Matarese obtained a note from Dr. Williams stating that Plaintiffs' apartment should be proven free of mold. After returning from the doctor, Ms. Matarese showed Defendant McGregor the note and told him that she was terribly ill from her cough, such that she could not breathe, and her apartment needed to be proven free of mold. He told her that Archstone had mold problems in the past, and there was nothing he could do. He did not check her apartment for mold or otherwise follow APC mold remediation protocol. Mr. McGregor testified that he did not interpret the note to require him to perform additional tests to make sure that the apartment was mold free. Rather, he believed that the fact that he did not identify mold in the apartment was sufficient compliance with the note.

In the summer of 2008, APC painted in two units close to Plaintiffs' apartment. Ms. Matarese requested accommodations in connection with these projects, but her requests were denied.

Finally, also during that time, Ms. Bauman testified that a sewer smell emanated from the bathroom next to her bedroom in her apartment. Ms. Matarese and Ms. Bauman complained a number of times. Both Defendant Garcia and Defendant McGregor smelled the noxious odor and confirmed that a sewer smell came from Ms. Bauman's bathroom. Defendant McGregor contacted a plumber about the issue. APC personnel made repeated attempts to determine the source and fix the problem to no avail. They suggested that Ms. Bauman run water in the

14

bathtub to eliminate the smell, but the smell continued to gravitate into Ms. Bauman's bedroom. Mr. Garcia told Ms. Bauman and Ms. Matarese that he would check the apartment below Ms. Bauman's unit on August 6, 2008, when the apartment below Ms. Bauman's was vacant, to see if the smell originated there.

Ms. Matarese called the front desk repeatedly on August 6 and August 7, 2008 in search of Mr. Garcia, so she could inquire about the status of his investigation into the source of the sewer smell. On August 7, 2008, Ms. Matarese was finally told that Mr. Garcia was with the new tenants who had moved in to the apartment below Ms. Bauman's. Ms. Matarese went to the apartment to find Mr. Garcia. Ms. Matarese knocked on the tenants' door and asked to speak to Mr. Garcia, who she had been told was inside the apartment. Mr. Garcia directed Ms. Matarese to the hallway, where Ms. Matarese became very upset, stating that Mr. Garcia had not done as he had promised and that nobody was listening to her.

As explained more fully below, the next day, Ms. Matarese was informed that APC was not going to renew Plaintiffs' lease when it expired on October 31, 2008. However, Plaintiffs and Ms. Bauman continue to reside at APC. Plaintiffs continue to request accommodations in writing, often with certification from Dr. Williams, when events in the building might trigger Ms. Matarese's chemical sensitivities. In large part, these requests have been denied or ignored.

On or about March 20, 2009, Ms. Matarese provided Defendants with a Medical Verification Letter from Dr. Williams affirming that Ms. Matarese has a disability as defined under the Fair Housing Act and stating that it was necessary to avoid exposing Ms. Matarese to, *inter alia*, paint, paint fumes, paint chemicals, smoke, dust, and mold. In spite of this additional indication of Ms. Matarese's medical condition, Defendants continued to deny Ms. Matarese's requests for accommodations, such as providing notification when painting was going to be done

15

and venting fumes, so they do not reach her apartment. In response to one of Ms. Matarese's letters requesting an accommodation, Ms. Matarese received a letter dated October 16, 2009 from Defendants' attorney, Mr. John Raftery. In the letter, Mr. Raftery wrote: "We recognize and acknowledge the disability that you previously identified. All reasonable requests for accommodation will be granted." (Pls.' Ex. 78.) Even after this acknowledgment of Ms. Matarese's handicap and assurance from Defendants' attorney, APC continued to deny Ms. Matarese's requests for accommodations.

## Ms. Matarese's Visits to Dr. Williams and Dr. Alpan

Ms. Matarese has been treated by two doctors for health issues related to her chemical sensitivities since the start of the renovation project at the end of 2006: Dr. Oral Alpan, a Board-certified and NIH-trained allergy specialist, and Dr. Jack Williams, a Board-certified ear, nose, and throat specialist. Both Dr. Alpan and Dr. Williams testified at trial about their visits with Ms. Matarese since December 2006.

On December 20, 2006, Ms. Matarese first went to see Dr. Williams complaining that she had had nosebleeds, itchy ear, and a cough. Dr. Williams conducted a physical examination and determined everything was normal except for some scabs in Ms. Matarese's ear and redness in her ear canals. He diagnosed her with rhinitis, which is inflammation of the nose, eczema for the skin condition on her ears, and bronchitis. Ms. Matarese did not have any breathing difficulty. Dr. Williams determined that a possible cause of the nosebleeds was the dry winter air. Dr. Williams did not otherwise investigate or determine a cause for Ms. Matarese's conditions. Dr. Williams prescribed medication for the bronchitis and nose, and he told her to see a dermatologist about the ears.

Shortly thereafter, on December 28, 2006, Ms. Matarese had her first visit with Dr. Alpan. Before seeing Dr. Alpan, Ms. Matarese submitted a patient triage, providing some information about her medical history and the reason for her visit. At the visit, Dr. Alpan performed various allergy tests, such as to mold, different animals, dust, and certain external and environmental elements, including, among others, grass, feathers, and trees. From these tests, he determined that Ms. Matarese was highly allergic to dust mites and house dust. Ms. Matarese took a spirometry examination to measure her ability to blow air out and take air in. The results indicated that she had a completely normal breathing pattern with no obstruction or restriction. Dr. Alpan did not treat Ms. Matarese for a respiratory infection or chemical sensitivities.[8] He diagnosed her with allergic rhinitis and chronic sinusitis.

Approximately three months later, on March 27, 2007, Dr. Alpan provided Ms. Matarese with the letter to APC described above, stating that he had been treating her for multiple allergies, chemical sensitivities, and respiratory infections, and that APC should avoid exposing her to various chemicals. Dr. Alpan admitted at trial that he had been referring to Ms. Matarese's dust allergy. He explained that the reason he advised that she should not be exposed to the chemicals identified was that patients with allergies are usually sensitive to these chemical triggers. He confirmed that he was not treating her for chemical sensitivities.

In March 2007, Dr. Williams received a handwritten note from Ms. Matarese, explaining that she had had a respiratory infection since February 2007. Dr. Williams had not seen Ms. Matarese since December 2006. He had no knowledge of this respiratory infection and had not treated her for such.

---

[8] At the visit, Dr. Alpan also considered, but ultimately did not diagnose Ms. Matarese with, asthma, rhinitis, a cough, and vocal cord dysfunction.

17

From the end of March 2007 through September 2007, Ms. Matarese saw Dr. Williams at various times and Dr. Alpan once. She had problems with ear infections and inflammation of the ear, spring-time allergies, eczema, and in April 2007, Dr. Alpan diagnosed her with rhinitis and chronic sinusitis. Otherwise, everything was normal, and the doctors did not identify or diagnose her with any breathing difficulty.

On November 16, 2007, during the time she was in discussion with Mr. Mann about painting inside her unit, Ms. Matarese went to see Dr. Williams. She explained to him that APC intended to paint inside her apartment, and when she had been exposed to this type of paint before in 2006, she had developed a respiratory infection and had difficulty breathing. She obtained the letter from Dr. Williams that she submitted to APC advising them not to expose Ms. Matarese to various chemicals.

At trial, Dr. Williams explained that the chemical sensitivities to which he referred in the letter were the various medications and the resulting bacterial rhinosinusitis. He stated that he had no information of anything specific, such as paint, that Ms. Matarese might have been exposed to that was having a negative impact on her health or safety. However, he explained that, due to her sensitivity to medication and other things in the past, the less she was exposed to the better.

Ms. Matarese did not see either Dr. Williams or Dr. Alpan for the next five months. She saw Dr. Williams at the end of March 2008 and again in May 2008 for ear cleanings. At both of these visits, Dr. Williams determined that everything else was normal, and there were no signs of breathing difficulties. On May 30, 2008, Dr. Williams observed that she had some wax in her ear and crusting in her nose. He diagnosed her with ear wax, eczema, and rhinitis, but no breathing problems.

Ms. Matarese saw Dr. Williams a bit more frequently in the middle of June 2008, which was shortly after the repairs in her apartment, her exposure to smoke from the neighbors, and the leak and resulting mold found in her mother's apartment. On June 13, 2008, Ms. Matarese saw Dr. Williams because she was experiencing a sore throat, phlegm buildup in her throat, failure of certain medications, a cough, and a headache. She reported that she had been exposed to paint fumes and mold. Upon examination, Dr. Williams determined that everything was normal except she had a red throat. He diagnosed her with inflammation of the throat and eczema and gave her an antibiotic. The cause of her condition was not determined. Dr. Williams testified that the mucus was causing some breathing difficulty, but that the level of mucus was no different than that of, for example, someone with a sinus infection.

Ms. Matarese returned to see Dr. Williams on June 18, 2008. She complained of her continued sore throat, and she felt like the problem had moved into her lungs. Ms. Matarese told Dr. Williams that she was constantly coughing and that it felt like thrush, which is an oral yeast infection. Dr. Williams conducted an examination and determined that everything was normal except for her throat. With respect to her throat, Dr. Williams testified that it was relatively normal, except for some "mild white" on the tongue. He diagnosed her with thrush and pharyngitis. Dr. Williams explained that the antibiotic that Ms. Matarese was taking could have caused the thrush because there were no bacteria to prevent the growth of yeast. He prescribed her with an oral topical antifungal. Dr. Williams did not investigate or determine the cause of Ms. Matarese's condition. Ms. Matarese did not exhibit any breathing difficulty.

Ms. Matarese returned on June 25, 2008 complaining of a sore throat, sore mouth, coughing, wheezing, and fatigue. Dr. Williams conducted a physical examination and determined that everything was normal, including her oral cavity and nasal mucosa. He

diagnosed her with oral candida or thrush and prescribed an antifungal. He did not investigate the cause of the thrush. In response to Ms. Matarese's complaints of breathing difficulty, he ordered a chest x-ray to ensure that he was not mishandling pneumonia. The chest x-ray returned with results that were relatively normal. The radiologist indicated in the report that the lungs were mildly hyperinflated, which could have been due to a deep breath; however, underlying chronic pulmonary disease ("COPD") could not be excluded. No follow up was performed in connection with this x-ray because there was nothing on the report that alarmed Dr. Williams. Dr. Williams advised Ms. Matarese to see internist Dr. Taubin, who was qualified to handle problems with lungs. Also during that visit, even though Dr. Williams did not believe that the reported mold exposure caused Ms. Matarese's oral candida, he provided a note written on his prescription pad paper, stating that Plaintiffs' apartment should be proven free of mold.

A month later, on July 25, 2008, Ms. Matarese returned to Dr. Williams for a follow-up visit. Diflucan had been effective for the cough. There was still the coating in her mouth. Other than some ear wax, which was removed, Dr. Williams determined that everything was normal. He noticed a decrease of the white coating in her oral cavity and continued the diagnosis of her oral candida. There was no indication of any breathing difficulty.

Ms. Matarese next saw Dr. Williams on September 26, 2008.[9] A physical examination indicated that everything was normal except nasal mucosa. Dr. Williams took a culture from her

---

[9] There is a medical record from September 12, 2008, but there does not appear to be any indication that Dr. Williams saw Ms. Matarese that day. In any event, she had her ears cleaned out, and there is no report of any breathing difficulty.

right passage, and it came back with no growth. Dr. Williams did not order a fungal test. Ms. Matarese's pharynx was normal, and there were no signs of breathing difficulty.

Almost two months later, on November 21, 2008, Ms. Matarese had another visit with Dr. Williams for an ear cleaning. Ms. Matarese reported that her mucus was under control, and her throat felt better. An examination indicated that everything was normal. Dr. Williams diagnosed her with candida, rhinitis, and chemical sensitivity, which Dr. Williams testified referred to multiple sensitivities to medication he had tried to give her, including the drug that was bothering her nose. Ms. Matarese did not report or exhibit signs of breathing difficulty.

On December 19, 2008, Ms. Matarese went to see Dr. Williams to discuss legal issues and problems with certain medications. A physical examination revealed that everything was normal except her oral cavity. Dr. Williams indicated that there was improvement, and it was "looking good." At the time, Ms. Matarese was complaining of a cough, but there were no breathing difficulties.

That day, Dr. Williams wrote a letter to Dr. Joel Taubin, requesting that he evaluate Ms. Mataerese's cough, oral cavity, and general health, including the severe tiredness and tendency to contract infections. In the letter, Dr. Williams summarized his history with Ms. Matarese, including her complaints, his diagnoses, and her reports of exposure to certain chemicals. In the two-page letter, the only statement that Dr. Williams made about any breathing difficulty was in describing his June 25, 2008 visit with Ms. Matarese, at which Ms. Matarese complained that her cough was so bad she could not breathe. Dr. Williams explained that he sent her for an x-ray, prescribed some medication, and that Ms. Matarese's cough had diminished within a few days.

On December 24, 2008, Ms. Matarese returned to see Dr. Williams because her throat was bothering her. Dr. Williams examined her and determined that everything was normal. Her

oral cavity did not exhibit any redness or thrush, but he diagnosed candida. She did not have any breathing difficulty.

On December 29, 2008, Ms. Matarese returned to see Dr. Alpan. He identified that she had rhinitis, chronic sinusitis, and urticarial, which is a form of skin rash.

On January 17, 2009, Ms. Matarese returned to see Dr. Williams, complaining that she had been sick over the holidays, she was having pain in her lungs, and she had increased mucus and a dry cough. Dr. Williams examined her and determined that everything was normal, and that she was not exhibiting signs of breathing problems. Dr. Williams noted that Ms. Matarese was seeing a pulmonologist.

Finally, Dr. Williams saw Ms. Matarese once in February 2009 and once in March 2009. The reason for the February 2009 visit was to follow up with her nasal drip and to remove wax from her ears. She had a productive cough, but Dr. Williams did not identify any breathing difficulties. He diagnosed her with bronchitis.

On March 20, 2009, Ms. Matarese saw Dr. Williams for the wax in her ears and to check her throat. She reported that she was doing well recently. At this March visit, she presented Dr. Williams with a medical verification form for his signature. He signed the form, affirming that Ms. Matarese has a handicap as defined under the FHA and instructing that exposure to various chemicals should be avoided. Dr. Williams did not complete the handwritten instructions, and he did not know who had completed it. Dr. Williams testified that he treated her for the secondary effects of exposure to these agents. Dr. Williams testified that he did not conclude that particular ailments had been caused by exposure to identified agents, and in fact he had never indicated that these agents had caused her problems.

22

Allergist Dr. Howard Weiner testified on behalf of Defendants about his review of Ms. Matarese's medical records, deposition testimony, and parts of her trial testimony. Based on his review of Plaintiff's medical records, he concluded that exposure to paint did not cause Ms. Matarese's symptoms and complaints. Similarly, he concluded that exposure to mold did not cause Ms. Matarese's symptoms because there was no evidence that mold was actually found in Ms. Bauman's or Plaintiffs' apartment, and Ms. Matarese did not test positive for an allergy to mold. Finally, Dr. Weiner discounted Ms. Matarese's claim that she was exposed to secondhand tobacco smoke from her neighbor's apartment or from tenants' smoking on the balcony below Ms. Matarese's apartment, stating that any such exposure or exposure in the hallway was de minimus.

Dr. Weiner also made the following observations based on his review of Ms. Matarese's medical records. First, he highlighted the fact that a review of Dr. Williams' records indicated very few complaints about breathing or exposure to the chemicals to which Ms. Matarese claims to be sensitive. Further, Dr. Weiner's review of Ms. Matarese's medical records revealed no evidence of COPD associated with bronchitis, asthma, or emphysema, and Ms. Matarese's test results were all within normal values and did not support a COPD diagnosis. Dr. Weiner opined that Ms. Matarese's complaints were the product of somatic disorder, and that Ms. Matarese feels that she has the symptoms when there is no medical evidence to support them.

**Complaints About Ms. Matarese**

Defendants offered evidence that they received various employee and tenant complaints about Ms. Matarese. These complaints were not documented in her tenant file, nor were they the subject of any claim that Plaintiffs had defaulted on their lease. At no point in time was Ms. Matarese given the opportunity to respond to these alleged complaints.

23

The testimony and documentary evidence revealed that APC received complaints that Ms. Matarese fed the birds on her balcony in violation of APC rules and regulations. APC notified Ms. Matarese that such conduct was prohibited. In December 2003, APC management received a resident complaint regarding Ms. Matarese's disruptive yelling and spitting in the APC swimming pool after declaring that she had bronchitis. In June 2005, APC received a resident complaint regarding Ms. Matarese's harassment of lifeguards at the swimming pool; the resident complained that Ms. Matarese's conduct disturbed her use of the pool for relaxation and exercise. In addition, Defendants received complaints from tenants that Ms. Matarese would verbally accost them about their smoking. For example, the residents in the apartment immediately below Plaintiffs' unit complained that Ms. Matarese yelled at them when they were smoking on their balcony and made a comment to one of them in the elevator that he would die from smoking and lung cancer. This resident threatened to involve the police if her harassment did not stop, and he eventually moved from APC as a result of Ms. Matarese's disruptive behavior. Further, they received complaints from independent contractors about Ms. Matarese's behavior when the contractors were doing work at the building.

Finally, the individual Defendants were often exposed to, or received reports of, emotional outbursts from Ms. Matarese, and, throughout the years, they observed objectionable behavior on the part of Ms. Matarese.[10] For example, in June 2008, Ms. Matarese was accused

---

[10] Plaintiffs received a letter dated April 23, 2007 from then-Community Manager of APC, Mr. John Birkhofer, regarding Plaintiffs' overuse of coffee, paper, and pastries. Ms. Matarese wrote a letter to Mr. Scot Seller, Chairman and Chief Executive Officer, regarding the false accusations. Plaintiffs received a letter of apology, confirming that the April 23, 2007 letter was inaccurate and inappropriate, assuring that Mr. Birkhofer would be trained to properly meet Archstone communication standards, and including $200.00 in American Express gift checks as a token of apology.

of "catnapping" a neighbor's cat, and she stated that she would not return the cat until the neighbor stopped smoking. Ms. Veronica Ahmad, a member of the APC staff, had to retrieve the cat from Ms. Matarese's apartment. In addition, on August 7, 2008, Ms. Matarese caused a disruption when she went to another tenant's apartment to find Mr. Garcia regarding the sewer smell in Ms. Bauman's apartment, becoming very upset that Mr. Garcia had not followed up as promised and that nobody was listening to her. Finally, Ms. Deeqa Nur, who lived at APC, testified that Ms. Matarese often complained to her that Mr. McGregor was not responsive to her complaints and requests for accommodations. Ms. Nur found these frequent interactions with Ms. Matarese annoying because, even though she was an APC employee, she was in the building as a resident, and she was not responsible for addressing resident complaints.

**Rent Increases and Nonrenewal of Plaintiffs' Lease**

Plaintiffs' leases for their unit at APC generally ran for the 12-month period from November 1 through October 31 of the next year. APC usually provided information regarding lease renewals during the month of August prior to the expiration of that year's lease.

For their lease that ran from November 1, 2005 through October 31, 2006, Plaintiffs paid rent in the amount of $1,814.00 per month. Prior to the expiration of their 2005-2006 lease, Plaintiffs were offered a 12-month lease renewal at the rate of $2,175.00 per month. The market rate at that time for their apartment was $2,238.00, but APC applied a standard reduction for all existing tenants renewing their leases, reducing the offer rate to $2,175.00. By negotiating with the Community Manager, Plaintiffs obtained an even greater reduction, setting a rental rate of $1,975.00 for the lease that ran from November 1, 2006 through October 31, 2007.

In August 2007, shortly before the expiration of their 2006-2007 lease, there was no action regarding the renewal of Plaintiffs' lease for the next year. Ms. Matarese became very

25

concerned. She believed they were going to be evicted because she had requested an accommodation in May 2007 when APC personnel wanted to paint inside her unit in connection with the renovation project.

On October 23, 2007, Ms. Matarese asked about the renewal of Plaintiffs' and Ms. Bauman's leases. Mr. Stuart Shaginaw, the individual with whom she spoke, did not seem surprised that they had not received renewal information. According to APC internal documents, APC personnel had been considering nonrenewing Plaintiffs' lease in 2007. Ultimately, APC decided against the nonrenewal and issued an offer of renewal.

In a letter dated October 24, 2007, APC management sent a notice of renewal to Plaintiffs, offering them various rent amounts, depending on the duration of the selected tenancy. The offer rate for a 12-month lease was $2,640.00, which was approximately a 34% increase from their existing rent. Defendants offered Ms. Bauman a lease renewal at a 16% increase, from $1,935.00 to $2,235.00. Ms. Matarese was able to negotiate lower rates for Plaintiffs and Ms. Bauman. In a letter dated November 1, 2007, Defendants memorialized the negotiated terms, stating that Plaintiffs' renewal rate would be $2,490.00, and Ms. Bauman's renewal rate would be $2,088.00. Plaintiffs' renewal rate still amounted to a 26% increase, and Ms. Bauman's renewal rate was an 8% increase. These rates would start on January 1, 2008, and Plaintiffs and Ms. Bauman had the option of terminating on October 31, 2008 or December 31, 2008. On November 7, 2007, Plaintiffs executed a new lease for the time period January 1, 2008 through October 31, 2008 at a rate of $2,490.00 per month.

In the summer of 2008, as the expiration of Plaintiffs' lease drew near, Defendant McGregor wrote Defendant Mann, informing him that Plaintiffs' and Ms. Bauman's leases were coming up for renewal in October 2008. He asked Defendant Mann whether "a non-renew"

would be possible. Defendant Mann responded, "What are some of the examples that I can use to defend our actions?" He explained that he would need to know what happened after they "let her stay last year," so he could bring the matter to the attention of Ms. Sally Matheu, a Vice President of Operations.

Defendant McGregor emailed Archstone personnel Katrina Wood, Stuart Shaginaw, Veronica Ahmad, and Amilcar Garcia, stating, "Here is your chance. Let me know what you got." The next day, he contacted these individuals again, informing them that he needed responses by Thursday, July 24, 2008, "if we are going to build a case." Shortly thereafter, Mr. Stuart Shaginaw responded, stating that his only complaint was that Ms. Matarese was "a very time consuming resident," explaining that personnel often spent six or seven hours a week just focusing on her, and that she often complained about nonissues. However, he also acknowledged that a resident like Ms. Matarese could be good for the building because she recognizes and notifies management of problems as soon as she notices them.

On the morning of July 24, 2008, presumably after not hearing from the other APC personnel he had contacted, Defendant McGregor again emailed Veronica Ahmad, Amilcar Garcia, and Katrina Wood, stating: "Last chance for your thoughts!" Katrina Wood responded that afternoon, citing several examples of Ms. Matarese's inappropriate behavior. Specifically, she indicated that the residents in the apartment below the Matarese's complained of Ms. Matarese harassing them about their smoking, including yelling at them while they are smoking on their balcony and making comments about their getting cancer. In addition, Ms. Wood reported the "catnapping" incident in which an APC employee had to retrieve a neighbor's cat from Ms. Matarese's apartment after Ms. Matarese threatened to keep the cat until the neighbor

stopped smoking. Finally, the email from Ms. Wood included examples of Ms. Matarese harassing staff, even those who lived in the building but were "off duty."

Defendant McGregor compiled the information from Mr. Shaginaw and Ms. Wood into an email to Defendant Mann, which he entitled, "Linda – The Essay." Defendant McGregor wrote that he was seeking to nonrenew the leases of Ms. Matarese and Ms. Bauman. He explained that Ms. Matarese was "a detriment to the community and an excessive burden on staff," and "her behavior has produced a negative impact on residents." To support his request, Defendant McGregor cited the examples submitted by Mr. Shaginaw and Ms. Wood. He also wrote that Ms. Matarese "has no concept of boundaries," explaining that Ms. Matarese has been known to harass staff, residents, vendors, and prospective tenants regarding issues she is experiencing. He described her conduct as "a pattern of behavior that never ceases. If it is not mold, or smoke, it is paint smells or dogs . . . ." Notably, the issues to which Defendant McGregor largely referred generally related to Ms. Matarese's concerns about exposure to paint, smoke, and mold.

The following week, Defendant McGregor reached out to Defendant Mann regarding his request to issue a nonrenewal to Plaintiffs and Ms. Bauman. He explained that he was planning on sending renewal letters, informing APC tenants of a modest 2% increase in rent, and he asked if they had a chance at nonrenewing Plaintiffs and Ms. Bauman. In response, Defendant Mann instructed Defendant McGregor to issue all tenants a 3% increase, but that he should hold off on sending a renewal letter to Plaintiffs and Ms. Bauman.

On August 7, 2008, Defendant McGregor emailed Defendant Mann about the incident that occurred that day between Ms. Matarese and Defendant Garcia. Defendant McGregor explained Ms. Matarese's "emotional outburst" regarding Defendant Garcia's failure to address

28

the reoccurring sewer smell in Ms. Bauman's apartment and told Defendant Mann that Defendant Garcia then had to ensure the new tenant that Ms. Matarese was fine, and there was nothing wrong with their apartment. In response to Defendant McGregor's email about this incident, Defendant Mann responded: "That is the last straw."

The next day, Defendant Mann emailed Defendant McGregor, informing him that Ms. Matheu had approved the nonrenewal of Ms. Matarese. He explained that they needed to meet with her in person before the nonrenewal letter was issued, and he offered to join Defendant McGregor in meeting with Ms. Matarese. Mr. McGregor agreed that Mr. Mann should be present. Mr. Mann requested that Mr. McGregor schedule the meeting for the following Monday morning.

On Friday, August 8, 2008, Defendant McGregor left Ms. Matarese a voicemail message, stating that he wanted to meet with her regarding her leaks. Ms. Matarese returned his call and told him that she did not have leaks, but Defendant McGregor said he wanted to meet anyway. Despite Defendant McGregor's request to meet the following Monday, Ms. Matarese, concerned, took her mother and went to Mr. McGregor's office shortly after speaking with him.

When Ms. Matarese asked Defendant McGregor why he wanted to meet, Mr. McGregor informed Ms. Matarese that he, with the approval of Defendant Mann, had decided not to renew the leases of Plaintiffs or Ms. Bauman, and they must vacate their units when the leases expired. Mr. McGregor explained that Ms. Matarese had violated community rules and her lease by reporting the mold growth and sewer smell in her mother's apartment, smoke, and leaks, and she had violated other tenants' right to smoke. When Ms. Matarese asked Mr. McGregor to identify the specific provisions that she had violated, he could not point to the provisions but said that he was sure they were in the lease. Ms. Matarese had never previously been informed about lease

29

violations or complaints regarding her behavior from staff or other tenants. After repeatedly asking him to identify the lease provisions she had violated, Mr. McGregor became very angry and told Ms. Matarese that they were tired of accommodating her sensitivities to paint and cigarette smoke.

Ms. Bauman testified that she accompanied her daughter to the meeting with Defendant McGregor. Ms. Bauman recalled that Defendant McGregor told her and Ms. Matarese that APC would not renew their leases. Ms. Bauman also recalled that Defendant McGregor told Ms. Matarese that Archstone was tired of accommodating Ms. Matarese's complaints and sensitivities to paint and cigarette smoke.

At trial, Defendant McGregor denied making this statement but testified that it was possible he discussed Ms. Matarese's requests for accommodations to the painting and the smoking. The Court finds that Defendant McGregor is not credible and that, even if he did not say those exact words, he made a statement expressing his frustration as to Ms. Matarese's complaints of her chemical sensitivities and repeated requests for accommodations. During his testimony, Mr. McGregor demonstrated that he was frustrated with Ms. Matarese's frequent complaints and requests concerning her apartment and her mother's apartment. However, in contrast to Mr. McGregor's characterization of Ms. Matarese and her complaints, the evidence reveals that Ms. Matarese's complaints were proven to be grounded in fact. In each instance where she complained about paint, smoke, or noxious odors, there was testimony, often from APC personnel regarding their investigation into the complaint, that revealed that each complaint was based upon observable facts. Further, on the stand, Mr. McGregor exhibited an arrogant attitude toward Ms. Matarese, reflecting a bias toward her that was apparent from his verbal and nonverbal statements. Finally, the Court finds that Mr. McGregor's denials of any animus or

bias toward Ms. Matarese are undercut by his conduct toward Ms. Matarese and his e-mails to APC personnel attempting to "build a case" to remove Ms. Matarese from the building. The demonstration of such animus and bias supports the Court's finding that Defendant McGregor made the discriminatory statement during the meeting.

After the meeting, Ms. Matarese was very upset and terrified about what she, her husband, and her mother would do and where they would live. She was especially concerned given her illness and her mother's age and deteriorating condition.

On August 11, 2008, Ms. Matarese delivered a letter to Defendant McGregor regarding the August 8, 2008 meeting. In the letter, Ms. Matarese addressed the conduct that Defendant McGregor cited as the basis of Defendants' nonrenewal of their lease, explaining that she was being subjected to retaliation for her repeated complaints about mold and sewer odors. In the letter, Ms. Matarese did not mention Defendant McGregor's comment about being tired of accommodating her sensitivities to paint or smoke. Ms. Matarese testified that her letter was intended to state a case under the Virginia Landlord/Tenant Act and had nothing to do with claims for discrimination. She testified further that she simultaneously drafted a complaint to be filed with the Virginia Fair Housing Office regarding Defendants' discrimination, which included Defendant McGregor's statement.

Defendants memorialized the nonrenewal of Plaintiffs' and Ms. Bauman's leases in a letter dated August 11, 2008, signed by Defendant McGregor. Plaintiffs received the letter under their door on August 12, 2008. The letter informed Plaintiffs that Defendants were exercising their right to terminate Plaintiffs' lease at the time of expiration and that they needed to vacate their apartment by midnight on November 11, 2008, pursuant to paragraph 26.2 of the Lease

31

Agreement.[11]  Paragraph 26 concerns, in relevant part, the Landlord's right of reentry, removal, and re-renting and states that, in the event a resident breaches any of the terms or conditions of the lease, the owner shall have all rights and remedies available as recognized by applicable state law, including termination of the lease.

On August 17, 2008, Ms. Matarese discovered that the apartments of Plaintiffs and Ms. Bauman were advertised for rent on the Archstone website.  The website provided that the apartments would be available as of November 26, 2008.

On August 20, 2008, Ms. Matarese filed a complaint with the Arlington County Human Rights Commission against APC, alleging discrimination based on disability, which was sent to Defendant McGregor on September 3, 2008.  In her complaint, Ms. Matarese stated that, during the conversation in which Defendant McGregor informed her of the lease nonrenewal, he remarked that he was tired of Ms. Matarese requesting accommodations with regard to painting and residents smoking.

On October 6, 2008, Ms. Matarese and Ms. Bauman had a telephone conversation with Defendant Mann to discuss Ms. Bauman's lease because Ms. Bauman had not received any notification about renewal.  Defendant Mann told Ms. Matarese and Ms. Bauman that Defendants had assumed Ms. Bauman would leave with Plaintiffs after Plaintiffs' lease expired. Ms. Matarese explained that Ms. Bauman wished to remain at APC, and Defendant Mann told her that they would consider that option.

During this October 6, 2008 call, Ms. Matarese also requested that Mr. Mann reconsider the nonrenewal of Plaintiffs' lease.  Mr. Mann told Ms. Matarese that Archstone would not consider renewing her lease.  In addition, he told her that he would not transfer Plaintiffs to, or

---

[11] Paragraph 26 of the Lease Agreement does not actually contain any subparts.

allow them to rent at, another Archstone property, explaining that it would not be a good idea. Instead, he advised Ms. Matarese that "there are a lot of other communities out there, and I think you need to be, be [sic] looking around there and you'll find something that meets your needs I'm sure in the area. There's a lot of competition and that's what would be for the best."

Subsequently, Defendant McGregor cautioned certain regional Archstone personnel not to lease an apartment to Ms. Matarese and advised them to watch for the use of her maiden name, Bauman. Further, Ms. Matarese was put on APC's decline list at Saferent, the entity that screens Archstone's tenant applications.

On or about October 15, 2008, Ms. Matarese amended her housing discrimination complaint and filed a complaint with HUD. In her amended complaint, she alleged that Defendant Mann informed her that Defendants were not going to rent to her at any other Archstone Property. Ms. Matarese claimed that such conduct constituted retaliation for filing the original fair housing complaint. In connection with these complaints, the Virginia Fair Housing Office began to conduct an investigation of Ms. Matarese's claims.

At approximately 11:00 p.m. on October 29, 2008, the day Ms. Matarese's administrative complaints were served, APC attached an amended nonrenewal notice to Plaintiffs' door, informing Plaintiffs that their tenancy would be terminated at the expiration of the current Lease Agreement, and renewal options would not be offered. Defendants informed Plaintiffs that the letter served as notice to vacate their apartment by midnight on December 31, 2008 pursuant to paragraph 29 of the Lease Agreement. Paragraph 29 of the Lease states that the renewal of the lease is at the owner's option. Further, if the owner and tenant do not agree to a new lease term in writing, the lease shall automatically continue on a month-to-month basis, with all of the terms of the lease remaining in effect, except the tenant may be subject to double the

33

monthly rent. The owner must provide written notice of the rental rate 30 days in advance of the rent increase.

At trial, Defendant McGregor explained that the decision to nonrenew was not based on Plaintiffs' breach of their lease. Rather, Defendants had simply decided to exercise their right not to renew Plaintiffs' lease when it expired. In light of the present litigation, Plaintiffs remain at APC as holdover tenants. As holdover tenants, Plaintiffs' lease was converted to a month-to-month tenancy, whereby, with proper 60-day notice, they could be evicted.

At the end of July 2009, Ms. Matarese's administrative Fair Housing complaint was dismissed. The Fair Housing Board determined that there was no reasonable cause to believe that Defendants committed an unlawful discriminatory housing practice.

On September 25, 2009, Plaintiffs received a letter from Defendants' counsel, Mr. Raftery, stating that the eviction was going to be lifted, and Plaintiffs' tenancy would be changed to a month-to-month tenancy. He further informed Plaintiffs that Defendants had not issued Plaintiffs a rent increase, which would otherwise have been due if they had not been notified to vacate the apartment, so Defendants were going to be sending Plaintiffs notification of a rent increase that would be effective January 1, 2010. In a letter dated September 29, 2009 from Defendant McGregor, Plaintiffs were informed of an increase in rent to $2,964.00, effective January 1, 2010. (Defs.' Ex. 31.) In the letter, Defendant McGregor reminded Plaintiffs that they were currently in a month-to-month tenancy, but that the previous notice to vacate had been rescinded. Accordingly, in the event Plaintiffs did not want to incur the rent increase, they were to notify APC in writing by October 31, 2009 of the intent to vacate by December 31, 2009. Ms. Matarese responded to the letter, stating that she rejected it because she considered it a third

notice of eviction due to the rent increase that would occur if she did not provide notice of intent to terminate.

On or about October 20, 2009, Ms. Bauman received an invitation to renew her lease at APC when it expired on December 31, 2009. On December 20, 2009, Ms. Bauman received an email reminding her to renew her lease. On December 31, 2009, Ms. Matarese took Ms. Bauman to meet with the assistant community manager of APC and discussed renewal terms. The assistant community manager informed Ms. Matarese that she would need to confirm the terms with Mr. McGregor. Ms. Matarese followed up with the assistant community manager throughout January and into February 2010 about renewing Ms. Bauman's lease. Finally, she was informed that APC was not going to renew Ms. Bauman's lease, as they had been told by Mr. Raftery that they were not required to do so. Accordingly, Ms. Bauman remains a holdover tenant on a month-to-month tenancy.[12]

Plaintiffs testified that, as a result of their current tenancy with no set lease and the refusal of Ms. Matarese's requests for accommodation, Ms. Matarese has become very anxious, and the circumstances have caused her great torment and anguish. The anxiety and uncertainty has also caused a lot of stress and friction in Plaintiffs' marital relationship.

### III. CONCLUSIONS OF LAW

Based on the findings of fact stated above and additional facts added as necessary below, the Court makes the following conclusions of law.

---

[12] At trial, in addressing Defendants' Motion for Judgment after the close of Plaintiffs' case, the Court misspoke regarding the renewal of Ms. Bauman's lease. Specifically, the Court stated: "it appears that Ms. Bauman's lease has been renewed, so I don't think that there is any real question here before the Court [as to retaliation]." In fact, as the evidence shows and Defendants concede, Ms. Bauman's lease was not renewed, and she, too, resides at APC in a month-to-month tenancy.

The FHA was established to ensure that people who have historically been subject to discrimination in the housing markets would have an equal opportunity to housing. *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 731 (E.D. Va. 1992). The Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (codified as amended at 42 U.S.C. § 3601, *et seq.*), extended the protection of the federal fair housing law to persons with disabilities, prohibiting discrimination on the basis of a physical or mental handicap, as defined in the statute. 42 U.S.C. § 3604(f)(1). The FHA is "broad and inclusive in protecting against conduct which interferes with fair housing rights and is subject to generous construction." *People Helpers, Inc.*, 789 F. Supp. at 731.

To prove a prima facie case of discrimination under the FHA, a plaintiff must demonstrate that the housing action or practice being challenged was motivated by a discriminatory purpose or had a discriminatory impact. *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984).[13] Fair Housing Act claims based on disparate treatment are often evaluated under the *McDonnell-Douglas* burden-shifting analysis because direct proof of unlawful discrimination is often difficult to obtain. *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 564 (E.D.N.Y. 2007); *see Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451, 1452 (4th Cir. 1990) (explaining that fair employment concepts, such as the *McDonnell-Douglas* burden-shifting analysis, are often imported into fair housing law because, even though the statutes

---

[13] The Court previously granted Defendants' Motion for Summary Judgment on Plaintiffs' claims based on a theory of disparate impact because Plaintiffs did not produce any evidence, statistical or otherwise, demonstrating that Defendants had a facially neutral policy that had a disparate impact on a protected class. Accordingly, the Court is only evaluating Plaintiffs' claims under a theory of discriminatory intent.

create and protect distinct rights, "their similarities have traditionally facilitated the development of common or parallel methods of proof when appropriate.").

Under the *McDonnell-Douglas* scheme, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *Wentworth*, 493 F. Supp. 2d at 564; *see Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004) (setting forth the *McDonnell-Douglas* burden-shifting scheme in the context of an age discrimination case). In doing so, the plaintiff must show that discriminatory purpose was a motivating factor, but the plaintiff does not need to show that the discriminatory purpose was the dominant or primary purpose. *Smith & Lee Assocs., Inc. v. City of Taylor, Michigan*, 102 F.3d 781, 791 (6th Cir. 1996). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory rationale for the challenged action. *Wentworth*, 493 F. Supp. 2d at 564; *see Mereish*, 359 F.3d at 334. If defendant meets that burden, the presumption of discrimination disappears from the case, and the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action. *Wentworth*, 493 F. Supp. 2d at 564; *see Mereish*, 359 F.3d at 334. A plaintiff can do this by showing that the reasons offered by the defendant were not the true reasons and were, rather, a pretext for discrimination. *Wentworth*, 493 F. Supp. 2d at 564. Plaintiff maintains the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him or her. *Id*. Notably, where there is direct evidence of discrimination, the *McDonnell-Douglas* method of proof does not apply. *Pinchback*, 907 F.2d at 1452.

A. Defendants Violated FHA § 3604(f)(1) and VFHL Section 36-96.3(A)(8) (Counts I & II)

The Court holds that Defendants discriminated against Plaintiffs on the basis of Ms. Matarese's handicap in violation of FHA § 3604(f)(1) and VFHL section 36-96.3(A)(8) when

they refused to renew Plaintiffs' lease, converted the lease to a month-to-month tenancy, and refused to rent to Plaintiffs at other Archstone locations.

Under FHA § 3604(f)(1), it is unlawful to discriminate in the rental, or otherwise make unavailable or deny, a dwelling to a renter because of a handicap of the renter, or a person residing in the dwelling after it is rented. 42 U.S.C. § 3604(f)(1). This provision implicates the owner of a dwelling or its agent, as well as those individuals who are in a position to make a dwelling unavailable by being able to exercise influence or control over the disposition of a dwelling. *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 799 F. Supp. 695, 711 (E.D. Mich. 1992), *aff'd*, 18 F.3d 337 (6th Cir. 1994). To make out a prima facie case under this provision, plaintiff must show that he or she is a member of a statutorily protected class, that defendants were aware of plaintiff's protected status, that plaintiff was willing and qualified to rent housing, and that plaintiff was rejected. *See Soules v. U.S. Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 822 (2d Cir. 1992); *Valenti v. Salz*, No. 94 C 7053, 1995 WL 417547, at *3 (N.D. Ill. July 13, 1995). In this case, Plaintiffs proved that Defendants discriminated again them because of Ms. Matarese's handicap in their decision to nonrenew Plaintiffs' lease and refusal to rent to them at another Archstone location in violation of FHA § 3604(f)(1) and VFHL section 36-96.3(A)(8).

   1. <u>Ms. Matarese Qualifies as an Individual with a Handicap Under the FHA</u>

The Court holds that Plaintiffs proved that Ms. Matarese qualifies as a person with a handicap under the FHA because they demonstrated that Defendants regarded Ms. Matarese as handicapped. The FHA defines "handicap" as (1) a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 3602(h). The determination as to whether one has a handicap depends on the particular facts of each case.

38

*EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001). Here, as discussed below, Plaintiffs have proven that Ms. Matarese qualifies as an individual with a "handicap" that is protected under the FHA because, even though they failed to prove by a preponderance of the evidence that she suffers from an impairment that substantially limits her breathing[14] under FHA § 3602(h)(1), they have proven that Defendants regarded her as handicapped under § 3602(h)(3). Because the Court holds that Plaintiffs have proven that Ms. Matarese qualifies as an individual with a handicap under FHA § 3602(h)(3), the Court need not consider whether she qualifies under FHA § 3602(h)(2) based on a record of impairment.

First, Plaintiffs failed to prove that Ms. Matarese's condition qualifies as a handicap under FHA § 3602(h)(1) because they have not demonstrated that she suffers from an impairment that substantially limits her breathing. Under FHA § 3602(h)(1), handicap is defined as a physical or mental impairment, which substantially limits one or more of such person's major life activities. 42 U.S.C. § 3602(h)(1). "Substantially" is defined as "considerable or to a large degree." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 256 (4th Cir. 2006) (citation omitted). To constitute a substantial limitation on a major life activity, the impairment's impact on the major life activity must be permanent or long term. *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 274 (4th Cir. 2004) (citation and internal quotation marks omitted). Sporadic or intermittent manifestations of an illness are insufficient to establish a substantial limitation on a major life activity. *Rohan*, 375 F.3d at 276 (citing *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001)). A person is substantially limited in a major life activity

---

[14] As stated in this Court's Memorandum Opinion on Defendants' Motion for Summary Judgment, the Court will consider only whether Ms. Matarese's impairment substantially limits the major life activity of breathing.

39

when there is a significant restriction as to the condition, manner, or duration under which the person can perform the major life activity "'as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Sara Lee Corp.*, 237 F.3d at 352 (quoting 29 C.F.R. § 1630.2(j)(2) (2000)). The factors considered when determining if a plaintiff is substantially limited in a major life activity are the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment. *Bridges v. Reinhard*, Civ. No. 3:08cv253, 2008 WL 5412843, at *6 (E.D. Va. Dec. 29, 2008) (citing 29 C.F.R. § 1630.2(j)(2)).

Here, assuming without deciding that Ms. Matarese suffers from chemical sensitivities to paint, smoke, and mold, Plaintiffs have failed to prove that this condition rises to the level of handicap because they have not demonstrated that these chemical sensitivities substantially limit her breathing. Specifically, Plaintiffs failed to prove that she experienced anything other than episodic or sporadic reactions when exposed to paint, smoke, and mold, or that her breathing was otherwise impacted more than the average person of the general population when exposed to such chemicals. Plaintiffs offered as evidence Plaintiffs' testimony and Ms. Matarese's own letters regarding her condition, which described in conclusory fashion only that, when exposed to these chemicals, she experienced serious breathing difficulties and respiratory infections that would last for months. However, even assuming that a "months"-long reaction is of sufficient duration to qualify as a substantial limitation, Plaintiffs' testimony is contradicted by the medical records of Dr. Williams and Dr. Alpan, whom she saw frequently from December 2006 through 2009. Their medical records during this time period do not indicate that Ms. Matarese experienced difficulty breathing, even when the symptoms that allegedly caused her breathing

problems, including bacterial rhinosinusitis, thick mucus, cough, sore throat, or candida, were at their worst. Notably, even these symptoms that allegedly limited her ability to breathe were not diagnosed consistently throughout the relevant time period. In fact, only during the month of June 2008 did there appear to be concern about Ms. Matarese's breathing, but this problem was alleviated within the next month. Further, Dr. Alpan administered a spirometry exam to test Ms. Matarese's breathing, which results came out normal, and the fact that a lung x-ray that Dr. Williams ordered did not rule out potential problems is insufficient to establish that Ms. Matarese actually had substantial breathing difficulties. Notably, in Dr. Williams' letter to Dr. Taubin, he did not specifically request that Dr. Taubin check on her breathing problems. His discussion of Ms. Matarese's breathing problems was limited to describing her complaints from the June 25, 2008 visit, the fact that he ordered an x-ray in response, and that the problem soon after subsided. The absence of a consistent record of breathing difficulties to support Ms. Matarese's description of her alleged breathing limitations, especially when she visited these doctors with such frequency during the time period she claims her breathing was impaired, undermines Plaintiffs' claim that she experienced a substantial limitation on her ability to breathe.

In addition, Plaintiffs failed to prove the requisite causal connection between Ms. Matarese's exposure to paint, smoke, and mold and the alleged limitation to her ability to breathe. First, Plaintiffs failed to prove that Ms. Matarese had a heightened sensitivity to these chemicals. Although Ms. Matarese claims she is extremely sensitive to these chemicals and experiences severe reactions when exposed, her medical records do not support this alleged heightened sensitivity, and, in fact, her allergy test results indicated only a strong allergy to dust. Although Dr. Alpan testified that a dust allergy can be triggered by exposure to certain

41

chemicals, including paint, smoke, or mold, there is no evidence that this triggering effect occurred here. Moreover, the letters that Ms. Matarese obtained from Drs. Alpan and Williams indicating that she suffers from chemical sensitivities do not constitute medical confirmation that Ms. Matarese is sensitive to paint, smoke, and mold. Prior to these letters, Drs. Alpan and Williams were treating Ms. Matarese for sensitivities to other chemicals, including various medications, and they conceded that they had not been treating her for, and had no verified, independent knowledge of, chemical sensitivities to paint, smoke, or mold.

Second, even if Ms. Matarese had a heightened sensitivity to these chemicals, Plaintiffs failed to prove that Ms. Matarese's exposure to these chemicals caused a limitation to her ability to breathe. Specifically, in opining that Ms. Matarese's chemical sensitivities caused a substantial limitation on her ability to breathe, Dr. Williams based his causation analysis on the temporal relationship between the exposure and the symptoms and the fact that the symptoms were not inconsistent with such alleged exposure. Dr. Williams did not conduct any independent investigation to confirm that Ms. Matarese was exposed to such chemicals or that exposure to these chemicals caused her symptoms, and he did not attempt to eliminate other potential causes. Similarly, Dr. Alpan testified that Ms. Matarese's symptoms could have been caused by a variety of other factors, and he did not investigate the cause of Ms. Matarese's symptoms to confirm that they were a consequence of exposure to paint, smoke, or mold, rather than some other element. Thus, Plaintiffs have not proved by a preponderance of the evidence the requisite causal connection between Ms. Matarese's exposure to paint, smoke, and mold and her alleged

breathing difficulties. For these reasons, Plaintiffs failed to prove that she qualifies as an individual with a handicap under FHA § 3602(h)(1).[15]

However, Plaintiffs have established that Ms. Matarese qualifies as a person with a handicap under FHA § 3602(h)(3) because they have proven that Defendants regarded her as having an impairment that substantially limited her breathing. Under FHA § 3602(h)(3), an individual is "regarded as" disabled if a covered entity "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Adams v. Rice*, 531 F.3d 936, 945 (D.C. Cir. 2008) (citation and internal quotation marks omitted); *see* 42 U.S.C. § 3602(h); *Rohan*, 375 F.3d at 277 (citation and internal quotation marks omitted) ("A person is regarded as disabled if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."). In addition, the implementing regulations define "is regarded as having an impairment" as: "'(1)

---

[15] Plaintiffs maintain their position that *Rohan v. Networks Presentations LLC*, 375 F.3d 266 (4th Cir. 2004) and *EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir. 2001) may no longer be good law due to the amendments to the Americans with Disabilities Act. Defendants rely upon these cases to argue that an impairment that is merely episodic does not qualify as a disability. Both *Rohan v. Networks Presentations LLC* and *EEOC v. Sara Lee Corp.* rely heavily on Supreme Court cases that were expressly rejected by the 2008 amendments to the ADA. As stated previously in this Court's Memorandum Opinion on Defendants' Motion for Summary Judgment, the 2008 amendments to the ADA did not go into effect until January 1, 2009. Most of Defendants' alleged discriminatory acts occurred before January 1, 2009. In any event, the Court's determination does not turn on this issue because, as discussed above, even if Ms. Matarese breathing difficulties were substantially limited, Plaintiffs still failed to prove the requisite causal connection between the exposure to paint, smoke, and mold and the breathing difficulties. Further, as discussed above, the Court holds that Defendants regarded Ms. Matarese as having a handicap, which, alone, is a sufficient basis upon which Ms. Matarese is afforded FHA protection.

43

[h]as a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation; (2) [h]as a physical or mental impairment that substantially limits one or more major life activities only as a result of the attitudes of others toward such impairment; or (3) [h]as none of the impairments defined in paragraph (a) of this definition but is treated by another person as having such an impairment.'" *United States v. S. Mgmt. Corp.*, 955 F.2d 914, 918 (4th Cir. 1992) (quoting 24 C.F.R. § 100.201(d)). In considering whether an individual is regarded has having a handicap, the court's analysis must turn on the actions and reactions of the individuals allegedly associated with the discrimination. *See Bridges*, 2008 WL 5412843, at *11 (discussing how to determine whether an employer regards an employee has having an impairment that substantially limits a major life activity).

Here, Plaintiffs proved by a preponderance of the evidence that Defendants regarded Ms. Matarese as having a handicap because Defendants believed that Ms. Matarese had chemical sensitivities to paint, smoke, and mold, which substantially limited her ability to breathe, and they treated her as having such an impairment. First, Defendant Mann, during the deposition at which he was the corporate designee, testified that Ms. Matarese was perceived by Archstone as somebody who had the handicap of chemical sensitivity. At trial, Defendant Mann asserted that what he meant when he made this statement at his deposition was that Ms. Matarese believed that she had a disability, but that Archstone did not share that perception. The Court does not find this newly-asserted interpretation consistent with the deposition testimony or otherwise credible, especially because Defendant Mann then testified at trial that Archstone had received letters from doctors stating that Ms. Matarese suffers from chemical sensitivities, that no other tenant in a 400-unit building provided similar doctors' letters, and they had no reason to

disbelieve the doctors' letters. In addition, Defendants' FHA training provided to all employees specifically identifies "chemical sensitivities" as a handicap if it substantially limits a major life activity. Moreover, at various times from 2005 through 2009, Defendants accommodated Ms. Matarese's sensitivities after she provided information orally, in writing, or both from her and her doctors regarding her sensitivities to paint, smoke, and mold. Defendants' accommodation of Ms. Matarese's condition after receiving such information demonstrates that they were accommodating her because of, and treating her as someone with, substantial breathing difficulties, not because of their desire to provide world-class service to their tenants. For example, when Defendants needed to paint Plaintiffs' windows from inside her apartment as part of the renovation project, Ms. Matarese spoke with Mr. McGregor in May 2007, providing him with a letter from herself and Dr. Alpan regarding her chemical sensitivities and how she had become severely ill and experienced a long-lasting respiratory infection during the exterior painting. As a result, Defendants did not enter Plaintiffs' apartment to paint. When the apartment was again scheduled for painting in November 2007, Ms. Matarese spoke with Defendant Mann to ensure that he understood her health condition. She provided him with the letter from Dr. Alpan and also provided Defendants with a letter from Dr. Williams that further confirmed her chemical sensitivities. Defendant Mann told Ms. Matarese that he understood her health issues and had known about them for some time. He offered various options to accommodate her, so they could complete the work. Defendants ultimately did not paint inside Plaintiffs' apartment because none of the options would work in light of Ms. Matarese's condition. This conduct shows that Defendants regarded Ms. Matarese as having a handicap because, even though she has none of the impairments that substantially limit her ability to

breathe, they mistakenly believed that she did or treated her as if she did. *Cf.* 24 C.F.R. § 100.201(d)(3).

In addition, both Defendant McGregor and Defendant Mann admitted that they knew Ms. Matarese had chemical sensitivities to various chemicals, including paint, and acknowledged that exposure to such chemicals substantially impacted her health and ability to breathe. Specifically, in response to requests for admissions during discovery, Defendant McGregor admitted that Ms. Matarese was an individual with disabilities. At trial, Defendant McGregor stated that this admission was made in error. However, again, the Court does not find this change in position credible, especially because, when asked about Ms. Matarese's disability at his deposition, Defendant McGregor identified Ms. Matarese's disability as chemical sensitivities and referred to Dr. Alpan's May 2007 letter. Moreover, at trial, Defendant McGregor stated that he understood Ms. Matarese was sensitive to various chemicals, which caused severe health difficulties, including respiratory infections, but he did not "put it together" and consider it a handicap. The Court finds that Defendant McGregor's understanding of Ms. Matarese's condition as substantially impairing her breathing and health, his admission and deposition testimony, and his efforts to accommodate Ms. Matarese demonstrate that he regarded her as having a handicap.

Further, Defendant Mann also acknowledged that Ms. Matarese's chemical sensitivities caused a substantial impairment in her breathing. Specifically, in his conversation with Ms. Matarese in November 2007 regarding painting inside her apartment, after telling Ms. Matarese that he had reviewed the letter from Dr. Alpan, he expressly stated that he had known of Ms. Matarese's condition for some time and understood "what she was dealing with." Further, in response to her explanation that she had experienced severe respiratory infections and health

problems when exposed to paint, he agreed that she could not remain in the apartment while it was being painted, nor could she stay at her mother's apartment if the paint fumes had not yet subsided there. In addition, he offered various options to attempt to accommodate her, further demonstrating his understanding of her condition and belief that she suffered from a handicap and treated her as such.

Finally, in a letter dated October 16, 2009, Defendants' counsel stated, "We recognize and acknowledge the disability that you have previously identified." This letter was in response to Ms. Matarese's requests for accommodations. This acknowledgment is further evidence that Defendants regarded Ms. Matarese as having a handicap and applies for all discriminatory conduct that occurred after October 16, 2009. Accordingly, Plaintiffs have demonstrated that Defendants regarded her as handicapped as defined in the FHA, and, therefore, they have satisfied their burden of proving that Ms. Matarese is a person with a handicap who is entitled to protected status under the FHA.

2. Defendants Discriminated Against Plaintiffs in Nonrenewing Plaintiffs' Lease

Here, Plaintiffs proved that Defendant discriminated against them in nonrenewing their lease, thereby converting the lease to a month-to-month tenancy, and refusing to rent to Plaintiffs at any other Archstone location. First, as discussed above, Plaintiffs proved that Ms. Matarese qualifies as an individual with a handicap under the FHA, and that Defendants were aware that she qualified as such. Second, Plaintiffs proved that they were willing and able to renew their lease when it came up for renewal in August 2008, and this continues to hold true to the present. Third, Plaintiffs proved that Defendants denied Plaintiffs the opportunity to renew their lease or rent an apartment at a different Archstone location. Specifically, on August 8, 2008, Defendant McGregor informed Ms. Matarese that Defendants would not be renewing Plaintiffs' lease, and

Defendants issued Plaintiffs two letters memorializing this decision, notifying Plaintiffs that they needed to vacate the apartment after the lease expired. Then, on October 6, 2008, Defendant Mann informed Ms. Matarese that they would not reconsider the nonrenewal and would not rent to Plaintiffs at a different Archstone building. Since then, Plaintiffs have resided at APC as holdover tenants on a month-to-month tenancy. The statute prohibits discrimination in the rental of an apartment, or otherwise making unavailable or denying a dwelling, on the basis of a handicap. The nonrenewal of a lease and refusal to rent to Plaintiffs at another Archstone building falls within the plain meaning of these terms. Even though Defendants issued Plaintiffs a letter in September 2009 rescinding the nonrenewal and notice to vacate, Defendants did not offer Plaintiffs a new lease, and Plaintiffs remain as month-to-month tenants, who may be evicted upon 60-days notice. Finally, Plaintiffs proved that Defendants' decision was motivated by discriminatory animus based on Ms. Matarese's handicap. Plaintiffs offered direct evidence, including the testimony of Ms. Matarese and Ms. Bauman, that, when Defendant McGregor informed Plaintiffs of the decision to nonrenew Plaintiffs, Defendant McGregor told Ms. Matarese that they were tired of accommodating her chemical sensitivities. *See Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982) (explaining that a bench trial judge properly proceeds to considering the evidence bearing upon the motivational issue without resort to the *McDonnell-Douglas* judicially created presumption, where direct proof of discrimination is adduced). Based on this direct evidence, the Court finds that Defendants discriminated against Plaintiffs in nonrenewing their lease and refusing to rent to them at another location, and Plaintiffs prevail on their refusal to rent claims.

Alternatively, even under the *McDonnell-Douglas* burden-shifting standard, Plaintiffs proved that Defendants discriminated against Plaintiffs in violation of FHA § 3604(f)(1) and

48

VFHL section 36-96.3(A)(8) on the basis of Ms. Matarese's handicap.[16] First, Plaintiffs made a prima facie showing that Defendants discriminated against Plaintiffs because of Ms. Matarese's handicap when deciding not to renew Plaintiffs' lease, converting them to a month-to-month tenancy, and refusing to rent to them at another Archstone location. Specifically, they proved that (1) Ms. Matarese qualifies as an individual with a handicap, (2) that Defendants were aware that she so qualified, (3) that Plaintiffs were willing and able to renew their lease, and (4) that Defendants refused Plaintiffs housing by nonrenewing their leases, which converted them to month-to-month tenants, and by refusing to rent to Plaintiffs at a different Archstone location. Further, Plaintiffs met their initial burden by producing evidence that discriminatory animus was a motivating factor for Defendants' actions in connection with Ms. Matarese's use and enjoyment of her housing. For example, they offered evidence that Defendant McGregor told Ms. Matarese that they were tired of accommodating her sensitivities, and that the decision came shortly after months of frequent requests for accommodation in connection with painting in Ms. Matarese's apartment, exposure to smoke from the neighbors, and exposure to mold from Ms. Bauman's unit, which Defendants either ignored or denied.

The burden then shifts to Defendants to assert a legitimate, nondiscriminatory reason for their actions. Here, Defendants produced evidence that the decision of nonrenewal and refusal to rent to Plaintiffs elsewhere was based on a long history of problems and complaints over the course of Plaintiffs' tenancy. Defendants produced evidence that they received complaints from other tenants, employees, and contractors, and their employees observed and had to address

---

[16] Based on this Court's analysis of the direct evidence of intentional discrimination and indirect evidence evaluated under the *McDonnell-Douglas* burden-shifting scheme, the Court need not also analyze the claims under a mixed-motive analysis.

various incidents with respect to Ms. Matarese's behavior in the APC community. Defendants maintain that this conduct detracted from the community members' use and enjoyment of APC facilities and was the reason for the nonrenewal. Therefore, the Court finds that Defendants have met their burden of producing a legitimate, non-discriminatory basis for their decision not to renew Plaintiffs' lease and their refusal to rent to them at another Archstone location.

Finally, Plaintiffs have satisfied their burden and proved that Defendants' explanation for nonrenewal was pretextual by showing that the reason was false and that the discrimination was the real purpose behind Defendants' decision. First, Defendants' inconsistency in the reasons for the nonrenewal of Plaintiffs' lease demonstrates the falsity of their nondiscriminatory reason and that the discrimination was the real purpose. The reason that Defendant McGregor gave to Ms. Matarese on August 8, 2008 explaining why Defendants were not renewing Plaintiffs' lease was that Ms. Matarese had violated the terms and conditions of the lease and community rules by reporting mold and leaks and violating other tenants' right to smoke. He also told her that they were tired of accommodating Ms. Matarese's chemical sensitivities. Then, in the two letters to Plaintiffs memorializing Defendants' nonrenewal decision and notifying Plaintiffs that they had to vacate the apartment, Defendants cite to two different lease provisions in support of their decision. Specifically, in the first letter, Defendants cite to paragraph 26.2 of the lease, which paragraph largely addresses the owners' rights and remedies for tenants' breach of the terms and conditions of the lease. In the amended nonrenewal letter, Defendants cite to paragraph 29 of the lease, which does not address tenant breaches. Instead, paragraph 29 states that renewal is at the option of the owner, and failure to execute a new lease agreement at the expiration of a lease term converts the tenancy to month-to-month. Further, when Ms. Matarese asked Defendant Mann to reconsider the nonrenewal decision or, alternatively, to transfer them to, or allow them

to rent at, a different Archstone property, Defendant Mann did not refer to any complaints or Ms. Matarese's disruptive behavior. Rather, he explained that it would be best for Plaintiffs to find a different apartment complex that would better meet her needs. Finally, at trial, Defendant McGregor explained that the reason for the nonrenewal was not because of any violations of the lease or community policies but, instead, was within their prerogative not to renew. This inconsistency undermines Defendants' credibility with respect to the purported nondiscriminatory reason, demonstrating that the purported legitimate reason was not the true reason, and that Defendants were attempting to find a valid explanation that would make it appear that the decision was nondiscriminatory.

In addition, Plaintiffs further established that Defendants' reason was pretextual by highlighting that Plaintiffs' APC file contains few, if any, of these purported complaints or history of Ms. Matarese's disruptive behavior. Ms. Matarese was not notified or given the opportunity to respond to these complaints. The majority of the complaints surfaced only after Defendant Mann needed reasons to "defend their actions," and Defendant McGregor reached out to the staff for examples to "build a case." Further, most, if not all, of the issues related to Ms. Matarese's complaints about exposure to chemicals; her requests for, and Defendants' refusal to provide, reasonable accommodations; and Ms. Matarese's complaints about Defendants' denial of her requests. The fact that much of the evidence related to Ms. Matarese's handicap demonstrates that discriminatory animus motivated Defendants in their decision not to renew Plaintiffs' lease. Accordingly, based on all of the evidence, the Court finds that Plaintiffs have demonstrated that Defendants' proffered, nondiscriminatory rationale was pretextual, and that Defendants acted with discriminatory intent in nonrenewing Plaintiffs' lease and refusing to rent

to Plaintiffs at a different Archstone location. Therefore, Plaintiffs have established that Defendants' violated FHA § 3604(f)(1) and VFHL section 36-96.3(A)(8).

B. Defendants Discriminated in the Terms, Conditions, or Privileges of the Rental of an Apartment in Violation of FHA § 3604(f)(2) and VFHL Section 36-96.3(A)(9)

The Court holds that Plaintiffs proved by a preponderance of the evidence that Defendants discriminated against them in the terms, conditions, and privileges of the rental of an apartment in violation of FHA § 3604(f)(2) and VFHL section 36-96.3(A)(9) because they denied Plaintiffs renewal options and benefits generally afforded to long-term tenants and eventually offered Plaintiffs a lease renewal at a disproportionately higher rate. Section 3604(f)(2) of the FHA makes it unlawful to discriminate against any person in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of that person." Although there are few cases interpreting this provision, this case can be resolved under the plain meaning of the text of the statute. *See S. Mgmt. Corp.*, 955 F.2d at 920 ("Statutory interpretation always begins (and often ends) with the words of the statute itself."). Here, unlike in connection with Plaintiffs' refusal to rent claims, Plaintiffs have not produced direct evidence of Defendants' discrimination in the terms, conditions, and privileges of the rental of an apartment, so the Court must evaluate the evidence under the *McDonnell-Douglas* burden-shifting scheme. The Court finds that, under the *McDonnell-Douglas* burden-shifting scheme, Plaintiffs proved that Defendants discriminated against them in the terms, conditions, and privileges of the rental of an apartment.

First, Plaintiffs have met their initial burden and set forth a prima facie case against Defendants for discriminating against them in the terms, conditions, and privileges of the rental of an apartment in violation of FHA § 3604(f)(2) and VFHL section 36-96.3(A)(9). Specifically,

Plaintiffs demonstrated that, when their lease was up for renewal at the end of their 2006-2007 lease, despite Plaintiffs' 18 years of residency at APC, Defendants refused to grant Plaintiffs the long-term tenancy discount. Defendants offered them a 34% increase in rent, which they ultimately only reduced to a 26% increase from the 2006-2007 lease terms. Further, Defendants nonrenewed Plaintiffs and, even after rescinding the nonrenewal and notice to vacate, still deny them a long-term tenancy and the associated discount despite their continued residence at APC. Plaintiffs have proven discriminatory animus as a motivating factor for this conduct by producing evidence that the rate increase occurred just months after Ms. Matarese provided the letter from Dr. Alpan and requested accommodations in connection with the painting project, which followed a long history of Ms. Matarese's requests for accommodations. Further, the 34% rate increase occurred after Defendants were unable to obtain approval for a nonrenewal of Plaintiffs' lease without any basis. Finally, this increase is significantly greater than any increase that Plaintiffs incurred in the past, which, at most, was an 8% increase.

After Plaintiffs met their initial burden of establishing a prima facie case, Defendants then met their burden of providing a legitimate, non-discriminatory reason for the conversion to a month-to-month tenancy and increase in rent. First, with respect to the exorbitant rent increase, Defendants produced evidence that the increase was due to an automated calculation in Archstone's pricing system, and the rate was within market standards. Specifically, Mr. Daniel Skodol of Archstone Communities, LLC, who testified concerning the pricing of apartment rates, explained that rental rates are set by a computer-automated system that accounts for set information, including market rates, building vacancies, and the length of the tenancy, and management does not exercise discretion in connection with setting lease rates. Second, with respect to the August 2008 nonrenewal and conversion to a month-to-month tenancy, Defendants

produced evidence that they issued the nonrenewal based on the long history of complaints and disruptive behavior. Further, because Plaintiffs remained in the apartment after the issuance of the nonrenewal, Plaintiffs' tenancy automatically converted to a month-to month tenancy.

Finally, in proving that Defendants discriminated against them in the terms, conditions, and privileges of the rental of an apartment, Plaintiffs satisfied their burden and proved that Defendants' legitimate, nondiscriminatory reason was pretextual. Specifically, the reason Plaintiffs did not receive the long-term tenancy discount upon renewing their 2006-2007 lease, despite their residing in the same unit since 1997, was that Defendants intentionally failed to timely provide renewal options before Plaintiffs' 2006-2007 lease expired. Defendants' complete lack of surprise that Plaintiffs had not received a renewal offer when Ms. Matarese requested information about renewing their lease and evidence that Defendants had been trying to nonrenew Plaintiffs in 2007 demonstrates that the untimely provision of renewal options was intentional. Without an executed lease agreement by the time their lease expired on October 31, 2007, Plaintiffs, through no fault of their own and despite their efforts to timely renew their lease, were converted to month-to-month tenants, which Defendants maintain prevented them from receiving the long-term tenancy discount in the computer system. However, Plaintiffs had been, and wanted to continue to be, long-term tenants. They were only denied such benefits because of Defendants' own conduct, not because of the calculation of an automated system. Further, even though Plaintiffs were ultimately able to negotiate a reduction from the initial offer of a 34% increase when they renewed their lease for the 2008 term, Plaintiffs were still subject to a 26% increase. In the past, the highest increase that Plaintiffs ever experienced was an 8% increase.

Moreover, despite Defendants' contention that rental rates were set by the computer and did not involve individual discretion, Plaintiffs produced evidence that management discretion played a role in setting rates. For example, Plaintiffs showed that for each year, they were consistently able to obtain a reduction from the initial rental rate offer through negotiations with management. Further, the email exchange between Defendants Mann and McGregor in which Defendant Mann instructs Defendant McGregor to issue a 3% increase for all tenants except Plaintiffs, rather than the 2% proposed by Defendant McGregor, demonstrates that the discretion of management plays a role in the establishment of rental rates.

Finally, as discussed at length above, Defendants' nonrenewal of Plaintiffs' lease and continued refusal to provide Plaintiffs with a long-term tenancy even after rescinding the notice to vacate, and the increase of Plaintiffs' rent thereafter, further illustrate Defendants' discriminatory purpose. Accordingly, Plaintiffs have proven that Defendants discriminated against them in the terms, privileges, and conditions of the rental of an apartment in violation of in violation of FHA § 3604(f)(2) and VFHL section 36-96.3(A)(9).

C. Defendants McGregor and Mann Made Statements of Preference, Limitation, or Discrimination Based Upon Handicap in Violation of FHA § 3604(c) and VFHL Section 36-96.3(A)(3)

The Court holds that Plaintiffs proved by a preponderance of the evidence that Defendants McGregor and Mann made discriminatory statements in connection with the rental of Plaintiffs' apartment in violation of FHA § 3604(c) and VFHL section 36-96.3(A)(3). Section 3604(c) of the FHA makes it unlawful to make a statement with respect to the rental of a dwelling that indicates any preference, limitation, or discrimination based on handicap. 42 U.S.C. § 3604(c). To establish a claim for a violation of this section, Plaintiffs must prove: (1) Defendants made a statement; (2) the statement was made with respect to the sale or rental of a

dwelling; and (3) the statement indicated a preference, limitation, or discrimination on the basis

of Ms. Matarese's handicap. *See White v. U.S. Dep't of Hous. & Urban Dev.*, 475 F.3d 898, 904

(7th Cir. 2007) (evaluating this provision in the context of a discrimination claim based on

familial status). This provision extends to all written or oral statements made by a person

engaged in the sale or rental of a dwelling. 24 C.F.R. § 100.75(b). Borrowing from Title VII

discrimination cases, courts have held that a statement of discrimination is made "with respect to

the sale or rental of a dwelling" only if it is related to the decision of whether or not to sell or rent

the property; a stray remark wholly unrelated to the decisional process is not actionable under §

3604(c). *See Campbell v. Robb,* No. 04-1567, 2006 WL 45253, at *5 (6th Cir. Jan. 9, 2006)

(citations and quotations omitted) (reviewing statements in the context of racial discrimination).

      To determine whether a statement indicates impermissible discrimination, an "ordinary

listener" standard is used. *See White*, 475 F.3d at 906. Under this objective standard, the court

must determine whether the alleged statement would suggest to an "ordinary listener" that a

person with the protected status is preferred or disfavored for the housing in question. *See id.*

The ordinary listener "is neither the most suspicious nor the most insensitive of our citizenry."

*Id.* (citations and internal quotation marks omitted).

      Here, based on the evidence presented at trial, the Court finds that Defendants McGregor

and Mann made discriminatory statements in connection with Plaintiffs' rental of a unit at APC

and other Archstone properties in violation of these provisions. First, when Defendant

McGregor informed Ms. Matarese of the decision of nonrenewal, he stated that the decision was

made with the express authorization of Mann, and they were "tired of accommodating Ms.

Matarese's sensitivities to paint and cigarette smoke." Under the ordinary listener standard, the

Court finds that Defendant McGregor's statement, made with the authorization of Defendant

Mann, indicated that Plaintiff was disfavored for the apartment based on her handicap. Second, under the ordinary listener standard, Defendant Mann made discriminatory statements in violation of these statutory provisions in connection with the refusal to reconsider Plaintiffs' nonrenewal or transfer Plaintiffs to, or allow them to rent at, another Archstone building. Specifically, Defendant Mann advised Ms. Matarese that "there are a lot of other communities out there, and I think you need to be, be [sic] looking around there and you'll find something that meets your needs I'm sure in the area. There's a lot of competition and that's what would be for the best." All of Ms. Matarese's unmet needs related to her complaints of, and Defendants' failure to accommodate, her chemical sensitivities. Defendant Mann gave no other independent reason explaining why Plaintiffs would not qualify for, or enjoy the comforts of, an apartment in another Archstone building. Under the ordinary listener standard, this statement indicates a preference or limitation based on Ms. Matarese's handicap. Accordingly, Defendants are in violation of FHA § 3604(c) and VFHL section 36-96.3(A)(3).

### D. Defendants Retaliated against Plaintiffs in Violation of FHA § 3617 and VFHL Section 36-96.5

Finally, Plaintiffs proved that Defendants retaliated against them for engaging in protected activity in violation of FHA § 3617 and VFHL section 96.5 by nonrenewing their lease and that of Ms. Bauman and applying an exorbitant rent increase while Plaintiffs remain at APC on a month-to-month tenancy. Section 3617 prohibits retaliation for exercising rights under the FHA. *People Helpers, Inc.*, 789 F. Supp. at 731 (citation and internal quotation marks omitted) ("[section 3617] protects persons who aid or encourage others in securing rights to equal housing opportunities and conditions by making it unlawful to coerce, intimidate, threaten or interfere with them because of their aid or encouragement."). To prevail, Plaintiffs must prove that

Defendants took adverse action against them in retaliation for their protected activity. *See*

*Bradley v. Carydale Enters.*, 730 F. Supp. 709, 721 (E.D. Va. 1989). A plaintiff must prove that

(1) the plaintiff was engaged in protected activity; (2) the defendant was aware of that activity;

(3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists

between the protected activity and the adverse action. *See Price v. Thompson*, 380 F.3d 209, 212

(4th Cir. 2004). Protected activity includes any "action taken to protest or oppose statutorily

prohibited discrimination" or "the exercise or enjoyment of rights under 42 U.S.C § 3604 to

equal services and conditions of housing." *See Miller v. Bd. of Managers of Whispering Pines at*

*Colonial Woods Condo. II*, 457 F. Supp. 2d 126, 131 (E.D.N.Y. 2006) (quoting *Cruz v. Coach*

*Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)); *People Helpers, Inc.*, 789 F. Supp. at 732.

Here, Plaintiffs have proven that Defendants retaliated against them in violation of FHA

§ 3617 and VFHL section 96.5 by nonrenewing Plaintiffs' lease, refusing to renew Ms.

Bauman's lease, and increasing Plaintiffs' and Ms. Bauman's rent by exorbitant rates. The Court

has evaluated the evidence of this conduct under the *McDonnell-Douglas* standard at length

above and determined that Defendants' nondiscriminatory reasons for such conduct are

pretextual. Accordingly, the Court will not repeat this discussion here and will only address

whether Plaintiffs established the requisite causal connection between the exercise of protected

activity and the adverse conduct, such that the conduct constitutes retaliation against Plaintiffs.

The Court finds that such conduct constitutes retaliation because Plaintiffs proved the

requisite causal connection between Plaintiffs' exercise of protected rights and Defendants'

adverse action. First, Plaintiffs proved that the nonrenewal of her lease and that of Ms. Bauman,

and Defendants' refusal to rent to them at another Archstone location, was in retaliation for Ms.

Matarese's repeated requests for reasonable accommodations and Ms. Matarese's filing of fair

housing complaints with administrative agencies and this Court. Specifically, Plaintiffs established that Defendants' nonrenewal occurred after a long history of Ms. Matarese's requests for reasonable accommodations and that Defendants decided not to renew the lease because they were tired of accommodating her chemical sensitivities. Further, Defendants initially explained that the nonrenewal was based on Ms. Matarese's violations of the lease and community policies. However, after Ms. Matarese filed her administrative complaints for Defendants' discrimination, Defendants issued a revised notice to vacate that did not cite to any provision related to a breach of lease, but, rather, it cited to the provision that states that renewal is at the option of the owner. The inconsistency in Defendants' reasons for its nonrenewal demonstrates discriminatory purpose, and its manifestation after the exercise of protected activity demonstrates the requisite causal connection to establish that it constitutes retaliation. Moreover, the nonrenewal of Ms. Bauman's lease had absolutely no basis. The fact that Defendants "assumed" she would leave with Ms. Matarese, when in fact Defendant McGregor sought the nonrenewal of Ms. Bauman's lease as well, further demonstrates that Defendants took such action solely because of Defendants' interactions with Ms. Matarese and her exercise of protected rights, which Ms. Bauman supported. Finally, the temporal proximity of Defendants' refusal to rent to Plaintiffs at another location with Plaintiffs' exercise of protected rights, where there was no reason other than the pretextual reason that a different company would better meet her needs, establishes that such action was retaliatory.

Second, Plaintiffs proved that the exorbitant rent increases were in retaliation for Plaintiffs' exercise of protected rights because, as discussed above, they occurred after a long history of requests for reasonable accommodations, were first raised at an exorbitant rate after a failed attempt at nonrenewal, and were further increased as Ms. Matarese continued to exercise

her rights by requesting more accommodations and filing the administrative complaints and the Complaint in this case. In addition, the fact that Defendants continued to keep Plaintiffs on a month-to-month tenancy and subjected them to an additional rent increase after rescinding the notice to vacate proves that Defendants were not acting in good faith and were retaliating against Plaintiffs for the exercise of protected rights. Accordingly, the Court holds that Defendants retaliated against Plaintiffs in violation of FHA § 3617 and VFHL section 96.5.

E. Plaintiffs are Entitled to Damages

The Court finds that Plaintiffs are entitled to damages for Defendants' violations of the FHA and VFHL set forth above. Pursuant to FHA § 3613(c) and VFHL section 36-96.17,

> if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d)[17] of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. §3613(c)(1). In addition, in its discretion, the court may award the prevailing party reasonable attorney's fees and costs. 42 U.S.C. § 4613(c)(2). Under Virginia law, when two or more tortfeasors cause a single indivisible injury to a third-party, and "it is impossible to determine in what proportion each contributed to the injury," then the individual tortfeasors are jointly and severally liable for that injury. *Gross v. Shearson Lehman Bros. Holdings, Inc.*, Nos. 01-1632, 01-1684, 2002 WL 1941434, at *4 (4th Cir. Aug. 23, 2002). Further, the FHA provides for vicarious liability, such that a principal may be vicariously liable for the discriminatory acts

---

[17] Subsection (d) provides: "Relief granted under this section shall not affect any contract, sale, encumbrance, or lease consummated before the granting of such relief and involving a bona fide purchaser, encumbrancer, or tenant, without actual notice of the filing of a complaint with the Secretary or civil action under this subchapter." 42 U.S.C. § 3613(d).

of its agent, making the principal liable for the full amount of the injury. *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *see City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1096-98 (7th Cir. 1992).

In their Second Amended Complaint, Plaintiffs seek the following in damages: (1) compensatory damages for Plaintiffs' physical injuries, economic loss, inconvenience, emotional distress, and other injuries that Defendants' discriminatory conduct caused; (2) punitive damages; (3) prejudgment interest; (4) attorneys' fees and costs; (5) equitable and injunctive relief to prevent Defendants from committing any further discriminatory housing practices; and (6) any other relief the Court deems appropriate. The Court will address each category in turn.

1. Compensatory Damages

The Court finds that Plaintiffs are entitled to compensatory damages for the economic loss that Defendants' discriminatory rent increase caused and for the emotional distress that Plaintiffs suffered as a result of Defendants' fair housing violations. "An award of substantial compensatory damages must be proportional to the actual injury incurred. The award must focus on the real injury sustained." *Hetzel v. County of Prince William*, 89 F.3d 169, 173 (4th Cir. 1996).

First, the Court finds that Plaintiffs are entitled only to nominal economic damages in connection with Defendants' violations under Counts I, II, VII, and VIII because Plaintiffs have not shown that they suffered actual injury for Defendants' violations for which they are entitled to compensation, especially in connection with their refusal to rent claims, considering they continue to reside at APC. *See Basista v. Weir*, 340 F.2d 74, 87 (3d Cir. 1965) (explaining that "it is not necessary to allege nominal damages" in order to recover); *Bradley*, 730 F. Supp. at 722 (stating that the tenant's continuing tenancy in his apartment unit may mitigate damages but does

not absolve defendants of liability for their retaliation against the tenant in violation of §§ 1981 and 1982). Second, Plaintiffs are entitled to compensatory damages for the economic loss they incurred as a result of Defendants' discriminatory rent increase in the amount they overpaid in rent from November 2007 to the present. The Court finds that Plaintiffs suffered tangible economic injury by the rent increase they were subjected to when Defendants failed to issue them a proper lease renewal, forcing them to go into a month-to month tenancy at an increased rate, and failing to negotiate a lower rate based on their history as long-time tenants as they had done in the past. Had Plaintiffs renewed their lease during the normal course and received the discount for existing tenants, Plaintiffs' base rent of $1,975.00 would have been subject only to the 3% rent increase applied to all tenants,[18] making their monthly payment $2,034.25 per month. Thus, for the time period from November 2007 through January 2011, Plaintiffs overpaid $455.00 per month. Accordingly, Plaintiffs are entitled to recover the total overpayment amount of $17,318.50 for this time period, plus $455.00 for each month since and including February 2011 that they overpaid in rent to Defendants, plus prejudgment interest accruing since November 1, 2007 when the overpayment started.

In addition, the Court awards Ms. Matarese $50,000 and Mr. Matarese $1,000 in compensatory damages for emotional distress because Plaintiffs offered sufficient evidence establishing that they suffered demonstrable emotional distress as a result of Defendants' discriminatory conduct. Emotional distress caused by housing discrimination is a compensable injury under the FHA. *Banai v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Times*, 102 F.3d

[18] Defendants may have applied to all tenants an additional rent increase since that 3% increase. However, Defendants did not offer any evidence of a generally-applied rent increase in the years since the 3% increase was set. Absent any evidence of a subsequent rent increase that applied to all tenants equally, the Court calculates this award based on the 3% increase.

1203, 1207 (11th Cir. 1997) (affirming award of $70,000 in total compensatory damages for emotional distress, divided equally between two plaintiffs); *United States v. Balistrieri*, 981 F.2d 916, 931 (7th Cir. 1992) (affirming $2,000 award in damages for emotional distress for each tester, where the evidence of emotional distress was based on the tester plaintiffs' minimal testimony). Such damages are available "for distress which exceeds the normal transient and trivial aggravation attendant to securing suitable housing." *Morgan v. Sec'y of Hous. & Urban Dev.*, 985 F.2d 1451, 1459 (10th Cir. 1993) (reversing award of $5,000 in emotional distress damages for insufficiency of the evidence because plaintiffs failed to prove the requisite causal connection between the discriminatory conduct and emotional distress).

Damages for emotional distress may be inferred from the circumstances as well as proved by the testimony. *Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir. 1983) (citing *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)). A plaintiff's testimony alone can support an award of compensatory damages for emotional distress. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)). Where a plaintiff's testimony is offered to support damages for emotional distress, such testimony must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* at 546-47 (quoting *Price*, 93 F.3d at 1254). The testimony cannot rely on "conclusory statements that the plaintiff suffered emotional distress" or the mere facts that a constitutional violation occurred or that the plaintiff was wronged. *Id.* at 547 (quoting *Price*, 93 F.3d at 1254). Rather, it must indicate with specificity "how [the plaintiff's] alleged distress manifested itself." *Id.* (quoting *Price*, 93 F.3d at 1254). However, "'[t]he more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more

conclusory evidence of emotional distress will be acceptable to support an award for emotional damages.'" *Krueger v. Cuomo*, 115 F.3d 487, 492 (7th Cir. 1997) (quoting *Balistrieri*, 981 F.2d at 932). Finally, the plaintiff must also show a causal connection between the violation and her emotional distress. *Bryant*, 333 F.3d at 547 (citation and internal quotation marks omitted); *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977).

Some factors the courts consider in determining whether substantial evidence supports an award of compensatory damages for emotional distress include: (1) evidence that the plaintiff suffered a physical injury or needed medicine as a consequence of emotional distress; (2) psychological counseling for the emotional distress; (3) pecuniary loss; (4) the degree of emotional distress; (5) the context of the events surrounding the emotional distress; (6) the evidence corroborating plaintiff's testimony; (7) the nexus between the challenged conduct and the emotional distress; and (8) any mitigating circumstances. *Id.* (citing *Hetzel*, 89 F.3d at 171-72; *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1266 (10th Cir. 1995); *Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir. 1993); *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986); *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1313-14 (7th Cir. 1985)); *see Marable*, 704 F.2d at 1220 (stating that lack of evidence of pecuniary loss, psychiatric disturbance, effect on social activity, or physical symptoms goes to amount, rather than the fact of damage). Plaintiff need not prove the exact measurement of damages for the harm suffered. *Marable*, 704 F.2d at 1220-1221.

Here, Plaintiffs have adequately articulated and otherwise established that they suffered demonstrable emotional distress that would entitle them to compensatory damages for emotional distress because, through their own testimony and corroborating evidence, they left no doubt that they were deeply affected by Defendants' discriminatory conduct. As discussed above, the

evidence demonstrates that Plaintiffs endured years of persistent and egregious discriminatory treatment by Defendants. As a result of such discrimination, Plaintiffs testified that the circumstances surrounding Ms. Matarese's requests and denials for accommodations and that related to the nonrenewal and rent increases, and the statements Defendants made to Ms. Matarese, caused them great stress and anxiety.

First, with respect to Ms. Matarese, Plaintiffs explained that Ms. Matarese became very upset, would cry, and was withdrawn and depressed as a result of the years of discrimination that she endured. Ms. Bauman also testified that Defendants' discrimination took an apparent emotional toll on her daughter. Further, Ms. Matarese's emotional reactions to the discriminatory treatment she received was corroborated by the testimony of Defendants McGregor and Mann, Ms. Nur, and Ms. Ahmad, who all testified as to Ms. Matarese's anxious state, her emotional outbursts, and the alleged scenes she caused at the front desk when attempting to get redress for her complaints. Given the discriminatory violations of which Ms. Matarese was a victim, the Court finds that such reactions were manifestations of her emotional distress, indicating that she was at a breaking point in attempting to be heard and assert her rights.

Further, the incident in August 2008 where Ms. Matarese became very upset with Defendant Garcia for not addressing the lingering sewer smell in her mother's apartment and for dismissing her with unfulfilled promises demonstrates the emotional distress that Ms. Matarese experienced for Defendants' failure to address her complaints. Defendant Mann characterized this incident as "the last straw" in support of the nonrenewal; however, the Court finds Ms. Matarese's frustration was warranted, especially because Defendants Garcia and McGregor both confirmed the sewer smell, and Defendant Garcia failed to address the situation as he had

promised. Ms. Matarese's becoming very upset and stating that "nobody listens to me" is evidence of the building distress that she experienced for the years Defendants violated her rights under the FHA.

In fact, this is not the only example where Defendants confirmed the validity of Ms. Matarese's concerns and did nothing. The evidence shows that, in most instances where Ms. Matarese complained about exposure to smoke, paint, or mold, an investigation by APC personnel confirmed the presence of such chemicals or wet drywall. For example, two of Ms. Matarese's complaints concerned wet drywall in her and her mother's apartments. Defendants observed the wet drywall, had to replace portions of the wall in both apartments, yet they did not take further action as required under their own mold remediation protocol to ensure that there was no mold growth, even when Ms. Matarese complained of observing mold. Defendants' failure to respond to Ms. Matarese's requests to mitigate her exposure and suffering applied generally to Ms. Matarese's complaints. They even refused to accommodate Ms. Matarese's simple requests that would require little to no effort on the part of Defendants, such as to provide notice when they were painting or to shut the doors of areas where they were painting. As a result, the evidence shows that Defendants' discriminatory actions placed Ms. Matarese in a constant state of fear that Defendants might paint without notice in the vicinity of her apartment, which would cause her substantial health problems. The Court credits Ms. Matarese's testimony regarding the stress and frustration she experienced regularly in the face of such egregious conduct, where even her smallest requests were ignored.

Moreover, the emotional injury Ms. Matarese suffered after the August 2008 meeting at which Defendant McGregor informed Ms. Matarese that they were not going to renew the leases of Plaintiffs and Ms. Bauman supports the award of damages for emotional distress. First, Ms.

Matarese learned for the first time that they would need to find a new home after 18 years at APC. After Defendant McGregor attempted to defend this decision on the basis of conclusory, undocumented complaints and rule violations, of which Ms. Matarese had no knowledge or opportunity to respond at the time of the alleged complaint, he ultimately told her the real reason for the nonrenewal: that Defendants were tired of accommodating her sensitivities. Moreover, Ms. Matarese's 95-year old mother, Ms. Bauman, who was also present at the meeting, had no complaints against her, and Mr. McGregor did not cite any improper conduct on the part of Ms. Bauman. As a result of this discrimination, Ms. Matarese testified that she felt terrified and anxious about where they were going to live and was extremely upset about Mr. McGregor's statement.

Defendants' discriminatory conduct also caused Mr. Matarese to suffer emotional injury. Mr. Matarese testified that it was upsetting to watch the toll that this was taking on his wife. Further, the circumstances provided stress to their marriage, given Ms. Matarese's constant frustration for Defendants' denial of her federally-protected rights.

Finally, Plaintiffs' testimony regarding their anxiety about their housing situation supports an award of damages for emotional distress. Notably, Plaintiffs testified that they were extremely anxious about where they were going to live after residing at APC for over 18 years. Moving is generally a very stressful activity, but this emotional turmoil was enhanced in these circumstances considering Ms. Matarese's reclusive behavior. Plaintiffs testified that Ms. Matarese leaves the house only to go to the store, to the doctor, or to run other short-term necessary errands. They do not spend the night outside of their apartment, go on vacation, or engage in other activities of extended time outside of their apartment due to Ms. Matarese's chemical sensitivities. Given this behavior and concern about Ms. Matarese's exposure to

chemicals in different environments, the Court finds that the stress and anxiety associated with Plaintiffs finding a new place to live was particularly grave. Moreover, they were especially concerned about their housing because they cared for Ms. Matarese's 95-year old mother, who would probably have to be put in a nursing home. Further, during the time period following the nonrenewal, they were always on guard because they never knew what Defendants were going to do next, such as posting notices on their door in the middle of the night, exorbitantly increasing their rent in an attempt to rid themselves of Plaintiffs, or making discriminatory comments to Ms. Matarese. Finally, the huge rent increase Plaintiffs paid to remain at APC, where they were consistently subject to discrimination, supports the award of damages for emotional distress.

The Court finds that, although Plaintiffs did not seek counseling or other psychological attention, nor did they suffer physical injury or require medical attention as a result of the alleged emotional distress, the circumstances are particularly egregious and warrant an award of compensatory damages for the emotional injury they suffered. It seems incongruous to find that Plaintiffs have endured years of Defendants' discrimination, from which they suffered apparent anxiety and distress, and then deny them damages for emotional distress. Such denial would only send a message that the Court values Plaintiffs' distress from Defendants' discrimination as nominal under the circumstances of this case. Living under such stressful conditions for three years, where Plaintiffs did not know if or when they would be evicted, coupled with the frustration over the continued failure to respond to Ms. Matarese's complaints in connection with her chemical sensitivities, is no way to live and warrants compensation for the suffering.

Finally, the amount of this compensatory damages award is not excessive when compared to other civil rights cases where damages for emotional distress have been awarded. For example, in *Bryant*, a race employment discrimination case, the Court affirmed an award of

$50,000 for emotional distress that was based solely on plaintiff's own testimony. *Bryant*, 333 F.3d at 546-47. The *Bryant* court upheld the award because 1) plaintiff's testimony that she was embarrassed, frustrated and angry, very disgusted, and that she did not feel very good about coming to work was sufficiently specific; and 2) the distress inflicted various specific physical ailments about the emotional trauma she suffered, which were to be considered, even though plaintiff did not seek medical attention for the physical symptoms. *Bryant*, 333 F.3d at 547. Similarly, in this case, Plaintiffs' testimony was sufficiently specific and was corroborated by other evidence, including Defendants' own testimony. Moreover, the award of $50,000 was upheld in 2003, and the opinion in this case is being rendered approximately 8 years later, under circumstances that are particularly egregious. For these reasons, the Court finds that the amount of the damages award is appropriate. Accordingly, because Plaintiffs have established that they suffered demonstrable emotional distress, the Court grants Ms. Matarese an award of $50,000 and Mr. Matarese an award of $1,000 in damages for emotional distress.

2. Punitive Damages

The Court awards Plaintiffs $100,000 in punitive damages against Defendant McGregor because he acted with malice and reckless indifference to Ms. Matarese's federally-protected rights under the FHA, and such an award is reasonable and not in violation of constitutional due process. As stated above, the FHA provides for the recovery of punitive damages for victims of discriminatory housing practices. 42 U.S.C. § 3613(c)(1). Generally, punitive damages may be imposed only if the defendant has acted willfully and with gross disregard to the plaintiff's rights. *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977). The standard for punitive damages used in employment discrimination and 42 U.S.C. § 1983 civil rights cases has been applied in FHA cases. *See, e.g., Quigley v. Winter*, 598 F.3d 938, 952 (8th Cir. 2010).

69

Punitive damages may be awarded in a civil rights case where the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally-protected rights of others. *Id.* at 953; *Alexander v. Riga*, 208 F.3d 419, 430-31 (3d Cir. 2000); *Bradley*, 730 F. Supp. at 726. "Malice" and "reckless indifference" do not refer to the egregiousness of the landlord's conduct but rather to the landlord's knowledge that it may be acting in violation of federal law, not that he is engaging in discrimination. *See Quigley*, 598 F.3d at 953; *Alexander*, 208 F.3d at 431 (finding that recklessness and malice may be inferred by a rental manager's repeated refusal to deal with African-Americans and consistent misrepresentations as to the apartment's availability). "Thus, it is sufficient that a defendant discriminate in the face of a perceived risk that his actions will violate federal law to be liable in punitive damages." *Quigley*, 598 F.3d at 953 (citation and internal quotation marks omitted). In considering whether to award punitive damages, the court should evaluate the nature of the conduct, the propriety of some form of pecuniary punishment, and the deterrent effect on future illegal conduct. *Gore*, 563 F.2d at 164.

In awarding punitive damages, the Court must consider whether the award is reasonable such that it comports with the Due Process Clause of the Fourteenth Amendment. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citation and internal quotation marks omitted) (explaining that "elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty . . . ."). The Supreme Court established three factors that courts should look to in assessing whether a punitive damages award violates due process: (1) the reprehensibility of the conduct; (2) the ratio between the punitive damages awarded and the harm likely to result, as well as the harm that actually has occurred; and (3) the

difference between the punitive damages awarded and the civil or criminal penalties that could be imposed for comparable conduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).

First, the degree of reprehensibility is perhaps the most important indicium of the reasonableness of a punitive damages award. *Id.* at 575. In assessing the degree of reprehensibility, courts must consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 419 (citing *BMW of N. Am., Inc.*, 517 U.S. at 576-77).

Second, the ratio between punitive and compensatory damages is the "most commonly cited indicium of an unreasonable or excessive punitive damages award." *BMW of N. Am., Inc.*, 517 U.S. at 580. To satisfy this factor, the punitive damages must bear a reasonable relationship to the compensatory damages. *Id.* What constitutes a reasonable factor varies from case to case; the constitutional line is not "marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Id.* at 580, 582. The Supreme Court has explained:

> low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* at 582. However, it is now established that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425; *see Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S.

1, 23-23 (1991) (finding that a punitive damages award more than four times the amount of compensatory damages is close to the constitutional line).

The final factor requires courts to compare the punitive damages award and the civil and criminal penalties available for comparable misconduct. The Supreme Court explained that "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW of N. Am., Inc.*, 517 U.S. at 583.

Finally, in making the determination as to punitive damages, a defendant's financial position is a proper consideration. *See Haslip*, 499 U.S. at 22; *Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 464 (1993). Under federal law, evidence of a defendant's financial worth is traditionally admissible for the purpose of evaluating the amount of punitive damages that should be awarded. *United States v. Big D Enters.*, 184 F.3d 924, 932 (8th Cir. 1999) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270 (1981)). The amount of evidence regarding financial worth need only be enough so the court can determine a proper damages amount that is commensurate with the objectives of deterrence and punishment. *Littlefield v. McGuffey*, 954 F.2d 1337, 1349-50 (quoting *Tolliver v. Amici*, 800 F.2d 149, 151 (7th Cir. 1986)). Defendants have the opportunity to offer mitigating evidence of worth. *Id.*

Here, the Court awards Plaintiffs $100,000 in punitive damages against Defendant McGregor because he acted with malice and reckless indifference to Ms. Matarese's rights under the FHA. First, Defendant McGregor knew of his obligations under the FHA with respect to individuals with handicaps because he had received FHA training explaining that discrimination against individuals with handicaps was prohibited and informing him of his obligations with respect to individuals with handicaps, including the obligation to provide reasonable

accommodations. Thus, Defendant McGregor knew of Ms. Matarese's federally-protected rights and his obligations in connection thereto. Despite this training and knowledge, Defendant McGregor consistently refused to provide Ms. Matarese with the accommodations she requested, even when they were supported by documentation from doctors, and he often outright ignored her requests and complaints. Not only did Defendant McGregor often refuse Ms. Matarese's requests for accommodations in violation of the FHA, in certain instances, he even ignored Archstone's own mold remediation protocol to the detriment of Ms. Matarese in light of her sensitivity to mold. In two instances involving wet drywall, Defendant McGregor and APC confirmed that the drywall was wet, yet they took no action consistent with APC's mold remediation protocol to verify whether mold was present. Further, and again in spite of his knowledge and training, Defendant McGregor pursued nonrenewal of the leases of Plaintiffs and Ms. Bauman because he was tired of dealing with Ms. Matarese's complaints and accommodating her chemical sensitivities. Moreover, Defendant McGregor's persistence in pursuing the nonrenewal of Plaintiffs' lease, as demonstrated by his search for examples to "build a case," his reaching out to employees to give them one last chance to bring up complaints, his extended plea set forth in "Linda-The Essay," and his nonrenewal of Ms. Bauman's lease without consulting her based on his "assumption" that Ms. Bauman would leave APC with Ms. Matarese, demonstrate malice against Ms. Matarese, which, as discussed above, was based on discriminatory purpose.

Finally, the nature of Defendant McGregor's interactions with Ms. Matarese demonstrates outright discrimination and reckless indifference to her rights. Specifically, when Ms. Matarese sought accommodations in connection with painting in her apartment, Defendant McGregor became angry and told her that Defendants had a right to enter her unit and paint in

whatever manner they chose. Further, when informing Ms. Matarese of Defendants' decision not to renew Plaintiffs' lease, he told her that they were tired of accommodating her chemical sensitivities. Because of Defendant McGregor's egregious conduct as it related to Ms. Matarese's rights under the FHA, the Court finds that Plaintiffs are entitled to an award of punitive damages against him in the amount of $100,000, as this amount will sufficiently punish and serve as a deterrent from future illegal conduct.

In addition, the Court finds that this amount is reasonable and consistent with the principles of due process as set forth in *BMW of N. Am., Inc.* First, Defendant McGregor's conduct was particularly reprehensible, which is the most important factor to consider in assessing whether an award is excessive. At every opportunity, Defendant McGregor intentionally violated Ms. Matarese's federally-protected rights and did not hide his discriminatory intent in his behavior. Defendant McGregor's demonstrated frustration, arrogance, and bias were clearly malicious and motivated his actions and reckless indifference to Ms. Matarese's rights in the face of a risk of danger to her health and safety. In addition, not only was there a risk of danger to her health by his failure to respond to her concerns, but Ms. Matarese actually suffered physical injury, including sore throats, coughs, and breathing difficulties. Further, Defendant McGregor's discriminatory conduct did not occur as one or even a few isolated incidents. Rather, he engaged in repeated discrimination with the failure to provide requested accommodations, nonrenewing her lease, increasing Plaintiffs' rent at an exorbitant rate, making discriminatory statements, and retaliating against Plaintiffs for the assertion of protected rights.

The Court finds that Mr. McGregor's denials of any animus or bias toward Ms. Matarese are undercut by his conduct toward Ms. Matarese and his e-mail to APC personnel attempting to

"build a case" to remove Ms. Matarese from the building. In one such e-mail, he told APC personnel that he was giving them one last chance to voice any complaints they might have against Ms. Matarese in support of his pursuit of a nonrenewal. Again, the Court notes that in communicating his decision not to renew Plaintiffs' lease, Defendant McGregor referred to complaints from other tenants, which are not documented in Ms. Matarese's tenant file, nor was she ever given an opportunity to offer an explanation or her side of the events. Additionally, Ms. Matarese received no notice that these tenant complaints would be a matter that lead to her removal from the apartment complex or that would constitute a default of her lease.

Further, in explaining the nonrenewal decision, Defendant McGregor referred to the inappropriateness of Ms. Matarese's complaints regarding mold in her mother's apartment. However, in contrast to Mr. McGregor's characterization of Ms. Matarese's complaints, the evidence reveals that Ms. Matarese's complaints, such as the complaint of mold, were proven to be grounded in fact. APC personnel testified that in connection with Ms. Matarese's complaints about paint, smoke, and noxious odors, an investigation revealed that the complaints were based upon observable facts. Thus, the malicious nature of Defendant McGregor's behavior, the frequency of his discriminatory conduct, and the risk of and actual danger to Ms. Matarese's health and safety demonstrate that Defendant McGregor's conduct was egregiously reprehensible and supports this award of punitive damages.

In addition, the ratio of punitive damages to compensatory damages further supports the reasonableness of the award. As stated above, single-digit awards are generally within constitutional limits, and an award of more than four times the amount in compensatory damages might be close to the line of constitutional propriety. *See State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425. Here, the punitive damages award is less than 1.5 times the award of compensatory

damages, which brings it well within the range of reasonable limits and shows that it is proportionate to the harm suffered and general damages recovered.

Further, a comparison of the punitive damages award to the FHA penalties available for comparable misconduct does not undermine the reasonableness of the award. The maximum fine permitted for a first violation of the FHA is $50,000. 42 U.S.C. § 3614(d)(1)(C)(i). Even though the amount here is double that fine, the fact that the FHA permits courts to impose a fine up to $50,000 in addition to compensatory and punitive damages supports the amount of this award. *Cf. Big D Enters., Inc.*, 184 F.3d at 933.

Finally, the Court finds that, in light of the financial circumstances of Defendants, this award is appropriate to meet the dual purposes of deterrence and retribution. Defendant SP Holdings currently, and for all times relevant to this case, owned APC. Employees of Defendant Archstone Communities, LLC manage APC. Defendant Archstone Communities, LLC is the entity through which all costs associated with APC are funneled, which are then reimbursed by the owner of the property, SP Holdings. At trial, Plaintiffs produced evidence of the financials of these companies. In 2009, SP Holdings had $95,096,561 in total assets. That same year, Defendant Archstone Communities, LCC had $54,264,380 in total assets and just over $2 million in cash. Based on these figures, a higher award is necessary to achieve the desired deterrent effect. In this case, the Court finds that the dual purposes of punitive damages would be achieved with an award of $100,000.

Defendants might argue that the net worth, rather than the total assets, is the proper figure to consider, and here, both Defendants had a negative net worth in 2009. However, Defendants conceded that the Archstone entities maintain a pass-through financial organization, such that funds are generally not kept with one entity for very long and are transferred to other entities to

pay liabilities, costs, and other expenses. There is no indication that these companies usually operate at a loss or that they could not maintain sufficient assets in their own accounts to pay a large liability. Defendants had the opportunity to but did not present evidence demonstrating that they were not financially able to pay a high judgment or that a lesser award would have the same deterrent effect. Moreover, Archstone general counsel, Mr. Thomas Reif, testified that, if Defendant Archstone Communities, LLC was liable for a judgment, it would pay it and would simply need to properly allocate that liability to a particular building. Thus, based on this evidence, the Court finds that an award of $100,000 is an appropriate amount to serve the deterrent and retributive purposes of punitive damages.

Further, the Court finds that the Archstone entity Defendants are vicariously liable for this punitive damages liability because Defendant McGregor was acting in a managerial capacity in the scope of his employment, and his conduct was not contrary to the principal's good-faith efforts to comply with the FHA. Borrowing the civil rights principles used in Title VII cases, punitive damages may be awarded against a principal because of an act by an agent if the principal authorized the act, the agent was employed in a managerial capacity and was acting in the scope of employment, or the principal ratified or approved the act. *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 542-43 (1999); *Equal Emp't Opportunity Comm'n v. Fed. Express Corp.*, 513 F.3d 360, 372 (4th Cir. 2008). For an individual to be acting in a "managerial capacity," the employee must be important but need not be of top management, officers, or directors. *Kolstad*, 527 U.S. at 543. In determining whether an agent is acting in a "managerial capacity," the court should consider the type of authority the employee has been given and the amount of discretion that the employee has in what is done and the manner in which it is accomplished. *Id.* Further, an intentional tort can fall within an individual's scope of employment if the conduct is the kind

the employee is employed to perform, it occurs substantially within the authorized time and space limits, and is done, at least in part, by a purpose to serve the employer. *Id.* at 543-44. However, a principal may not be vicariously liable for the discriminatory decisions of its managerial agents, where these decisions were contrary to the principal's good faith efforts to comply with the civil rights statute. *Id.* at 545; *Equal Emp't Opportunity Comm'n*, 513 F.3d at 372 (requiring a finding that the employer failed to engage in good-faith efforts to comply with the law to impute a punitive damages award based on reckless indifference on an employer).

Here, there is sufficient evidence to support the imputation of the punitive damages award against Defendant McGregor to the Archstone entity Defendants. First, as discussed above, punitive damages are properly awarded against Defendant McGregor because he acted with malice and reckless indifference in the face of Ms. Matarese's federally-protected rights, knowing of his obligations under the FHA. Second, Defendant McGregor, as Assistant Community Manager and then Community Manager of APC, was acting in a managerial capacity because he had the discretion to make decisions about lease renewals, rent increases, and whether to provide various accommodations on behalf of the Archstone entity Defendants. Further, Defendant McGregor was acting within the scope of his employment because he was performing the services that were in the normal course of his job responsibilities and in furtherance of serving his employer, and all of his conduct occurred at the place of business during working hours.

Finally, the Court finds that the Archstone entity Defendants failed to make good-faith efforts to comply with the FHA. The Court acknowledges that Defendants maintain FHA protocol and training, however, the mere existence of a compliance policy will not insulate Defendants from punitive damages liability. *See Equal Emp't Opportunity Comm'n v. Fed.*, 513

F.3d at 374. To avoid liability, the principal maintaining the compliance policy must take affirmative steps to ensure its implementation. *Id.* The evidence demonstrates that, even though Archstone maintained an FHA compliance policy, the entity Defendants failed to take affirmative steps to ensure compliance. On more than one occasion, Ms. Matarese contacted the Archstone corporate office regarding her complaints and requests for reasonable accommodations under the FHA. Once the corporate office got involved, the complaint was often addressed. However, the corporate office, knowing that Ms. Matarese's concerns were being ignored, did nothing to ensure future compliance.[19] For these reasons, the Court finds that the Archstone entity Defendants are vicariously liable for the punitive damages award against Defendant McGregor.

Finally, the Court denies Plaintiffs' request for punitive damages against Defendant Mann. Although Defendant Mann violated various provisions of the FHA as discussed above, his conduct did not demonstrate malice or reckless disregard for Ms. Matarese's rights under the FHA. There was evidence that Defendant Mann attempted to accommodate Ms. Matarese. For example, when Defendants sought to enter Plaintiffs' apartment to paint in November 2007, Defendant Mann agreed with Ms. Matarese that she could not be in the apartment, and he offered her various other options, including staying at her mother's apartment or staying at a hotel. In

---

[19] The Court declines to follow *Pumphrey v. Stephen Homes, Inc.*, 110 F.3d 60, 1997 WL 135688 (4th Cir. Mar. 25, 1997), an unpublished decision that Defendants cite that states "a principal is liable for punitive damages for the discriminatory acts of its agent *only* if the principal knew or ratified the acts." *Pumphrey*, 1997 WL 135688, at *3. *Pumphrey* was issued before the Supreme Court's decision in *Kolstad,* which was subsequently adopted by the Fourth Circuit. *See, e.g., Equal Emp't Opportunity Comm'n*, 513 F.3d at 371 (applying *Kolstad* standard). However, even under the *Pumphrey* standard, the entity Defendants are liable for the punitive damages award because they authorized or ratified Defendant McGregor's decision to nonrenew Plaintiffs.

addition, the nature of Defendant Mann's interactions with Ms. Matarese did not indicate the callous indifference to her federally-protected rights that Defendant McGregor exhibited. Accordingly, the Court denies Plaintiffs' request for punitive damages against Defendant Mann and awards Plaintiffs $100,000 against Defendant McGregor, for which the Archstone Defendants shall be vicariously liable.

### 3. Attorneys' Fees and Costs

The Court finds that Plaintiffs, as the prevailing party, are entitled to attorneys' fees and costs. FHA § 3613(c)(2) provides that the court, in its discretion, may award the prevailing party reasonable attorney's fees and costs. 42 U.S.C. § 3613(c)(2). In determining the amount of the award of attorney's fees and costs, the primary consideration must be given to the amount of damages awarded as compared to the amount sought. *Hetzel*, 89 F.3d at 173 (citation and internal quotation marks omitted). An attorney should recover the full compensatory fee for achieving excellent results; however, "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435, 439-40 (1983)). Applying these principles and those set forth in *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235 (4th Cir. 2009), within 10 days, Plaintiffs are ordered to submit proper documentation in support of the fees and costs that they seek for prevailing in this action. *See* Fed. R. Civ. P. 54(d) (allowing Court order to modify deadline for fee and cost submissions); *Gaskins v. BFI Waste Servs., LLC*, No. 07-1001, 2008 WL 2415869, at *3-*4 (4th Cir. June 16, 2008).

### 4. Equitable and Injunctive Relief

The Court finds that Plaintiffs are entitled to equitable relief to ensure that any lingering effects of Defendants' discrimination are eliminated, and that Defendants do not violate the FHA

and VFHL in the future. Pursuant to FHA § 3613(c)(1) and VFHL section 36-96-17, the court is authorized to issue any temporary or permanent injunction that it deems appropriate. Injunctive relief should be tailored to achieve the twin goals of (1) removing any lingering effects of past discrimination and (2) ensuring that the FHA is not violated in the future. *Marable*, 704 F.2d at 1221 (citation omitted). Under established principles of equity, in considering whether to grant injunctive relief, a court should impose a restriction that is no greater than necessary to protect the plaintiff from the injury of which he complains. *United States v. Hunter*, 459 F. 2d 205, 219 (4th Cir. 1972) (citation omitted). The plaintiff must show that such relief is necessary by demonstrating that there is a cognizable danger of recurrent violation; the court should deny an injunction only after examining the circumstances of the violations and determining that defendant will not continue the unlawful conduct. *Hunter*, 459 F. 2d at 219, 220.

Here, the Court enjoins Defendants from committing any further discriminatory practices against Plaintiffs. As part of this injunctive relief, Defendants are required to return Plaintiffs and Ms. Bauman to their status as residents of APC on annual leases. In setting a rental rate for Plaintiffs' lease, Defendants will offer an initial 12-month lease rate of $1,975.00, which was the monthly rental rate under Plaintiffs' 2006-2007 lease. Further, Defendants will offer Ms. Bauman a 12-month lease rate that is consistent with the rate she paid under her 2006-2007 lease. Hereafter, Defendants are prohibited from unequally applying rental criteria in a manner that discriminates against Plaintiffs or anyone else on the basis of handicap in violation of the FHA or VFHL. Accordingly, Defendants will be required to offer Plaintiffs renewal options, discounts, and preferences consistent with those provided to other long-term tenants and take all reasonable steps to ensure that Plaintiffs are treated in a nondiscriminatory manner regarding the terms of their tenancy at APC, such as by only applying the same rental increase that is applied

81

to all other long-term tenants. Finally, with respect to Ms. Matarese's requests for accommodations, Defendants are required to comply with the FHA and VFHL in providing Ms. Matarese with reasonable accommodations, including following their own FHA protocol in addressing requests for reasonable accommodations.

## IV. CONCLUSION

For the foregoing reasons, the Court finds Defendants liable with respect to Counts I, II, III, IV, VII, VIII, and XII and awards Plaintiffs damages as set forth above.

Accordingly, it is hereby

ORDERED that judgment is entered in favor of Plaintiffs Ms. Linda and Mr. Domenic Matarese and against Defendants SP Holdings, Archstone Communities, LLC, Mr. Malcolm McGregor, Mr. Mitchell Mann, and Mr. Amilcar Garcia on Counts I, II, III, IV, VII, VIII, and XII. It is further

ORDERED that Plaintiffs are entitled to nominal economic damages for Defendants' violations under Counts I, II, VII, and VIII. It is further

ORDERED that Plaintiffs are entitled to compensatory damages for the economic loss they suffered from Defendants' violations under Counts III, IV, and XII. Specifically, they are entitled to recover the total overpayment in rent in the amount of $17,318.50, plus $455.00 for each month since and including February 2011 that they overpaid in rent to Defendants, plus prejudgment interest since November 1, 2007. It is further

ORDERED that Plaintiffs are entitled to compensatory damages for emotional distress for Defendants violations under all Counts. Specifically, Ms. Matarese is entitled to an award of $50,000 and Mr. Matarese is entitled to an award of $1,000 in compensatory damages for emotional distress. It is further

ORDERED that Plaintiffs are entitled to an award of $100,000 in punitive damages against Defendant McGregor, and the Archstone entity Defendants are vicariously liable for this punitive damages award. It is further

ORDERED that Plaintiffs are entitled to an award of attorneys' fees and costs. In connection with this award, Plaintiffs are ORDERED to submit within 10 days proper documentation in support of the fees and costs that they seek for prevailing in this action. It is further

ORDERED that Plaintiffs are entitled to injunctive relief as detailed above.

A separate Rule 58 judgment Order will issue with this Memorandum Order.

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this _31st_ day of May, 2011.

Alexandria, Virginia
5/31/2011

_____/s/_____
Gerald Bruce Lee
United States District Judge